**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Paul M. HUGHES et al., Defendants.**

United States District Court
S. D. New York.

June 21, 1963.

Judgment Affirmed Jan. 9, 1964.
See 325 F.2d 789.

See also 195 F.Supp. 795.

Robert M. Morgenthau, U. S. Atty. for the Southern District of N. Y., for plain-

tiff; Donald J. Cohn and Gerald Walpin, New York City, of counsel.

Bruno Schachner, and Thomas A. Bolan, New York City, for defendants.

HERLANDS, District Judge.

This is a motion by the defendant pursuant to Rule 32(d), F.R.Crim.Pro., for leave to withdraw his plea of guilty to Count 32 (the conspiracy count) of Indictment Number 60 Cr. 980 and to enter a plea of not guilty. This motion was brought on by an order to show cause, dated April 26, 1963, returnable May 1, 1963.

On May 1, 1963, the Court ordered a full hearing on the motion. Testimony was taken on May 1, 20, 21, 23, 24, 25 and 28, 1963.

Indictment No. 60 Cr. 980, filed on November 18, 1960, named the defendant in 32 counts.

On December 12, 1960, the defendant pleaded not guilty. In December, 1960, Thomas A. Bolan, Esq., was retained as his attorney by the defendant.

Thereafter, Jerome J. Londin, Executive Assistant United States Attorney, (who was in charge of the case) and Bolan had a number of conversations. Among other things, they explored the possibility of a change in plea by the defendant; they discussed the count or counts to which the defendant might enter his guilty plea; they delineated the salient positions of the United States Attorney and the defendant relative to each other after the defendant shall have pleaded guilty in the event the defendant did plead guilty, such as, the question of adverse publicity in connection with the defendant's change of plea, the attitude of the Government with respect to possibly other criminal proceedings, the extent of the defendant's possible cooperation with the Government and the Government's stand on the day of sentencing in the light of such cooperation as the defendant shall have actually given by that time

## I.

There are fundamental differences between the Government and the defense as to (*inter alia*) the nature and extent of the cooperation that the defendant was supposed to give to the Government; and as to the nature and extent of the defendant's actual cooperation with the Government and the manner in which the Government has conducted itself in seeking to obtain the defendant's cooperation.

There is also a basic controversy between the Government and the defense as to whether the defendant was induced to plead guilty by virtue of an alleged assurance, promise or representation by the Government that the defendant would be given the privilege of obtaining one or more adjournments of the sentencing in Room 318 (where the criminal calendar and criminal motion part of the court is ordinarily held) in order to by-pass one or two judges whose alleged reputation for severity made them undesirable from the defendant's viewpoint.

On April 3, 1961, the defendant, with the advice of counsel, pleaded guilty to the 32nd count of the indictment. The minutes of the proceedings before Judge Metzner on April 3, 1961 are an exhibit herein (Exh. D. See Record of hearings upon the present motion, May 1, 1963, p. 43 et seq.; Record of May 23, 1963, p. 390). Before accepting the plea of guilty, Judge Metzner searchingly inquired into the pertinent circumstances.

Among the questions and answers in the record of the April 3, 1961 proceedings is the following:

"Q Has anything been promised or offered you to induce you to change your plea from not guilty to guilty?

"A No, your Honor."

Upon the hearing of the present motion, the defendant expressly reaffirmed the truthfulness of his answer to Judge Metzner's question. (Hughes, Record of

May 28, 1963, p. 845.) However, the defendant claims—and this claim poses another crucial difference between the defense and the Government—that in so answering Judge Metzner's question he understood the question to refer to whether he had been promised or guaranteed a specific sentence (Hughes, Record of May 28, 1963, pp. 830, 832, 843).

The Government argues that the defendant's unequivocal answer to Judge Metzner's simple and clear question demonstrates that the defendant's current claims are a spurious afterthought.

## II.

To determine the merits of the rival contentions of the opposing parties, the Court has conducted a plenary inquiry into the facts and has given comprehensive consideration to such legal authorities as the parties have cited in their memoranda as pertinent to the controlling issues.

The Government concedes that Bolan, the defendant's attorney, told the defendant "whatever the Government told Mr. Bolan" (Record of May 21, 1963, pp. 259, 264, 272, 291, 306–307)

The defendant does not claim that Mr. Bolan, the defendant's attorney, failed to disclose any materal fact to the defendant or that he said or did anything that constitutes incompetence, negligence, or misstatements (Record of May 21, 1963, pp. 270, 280). The defendant, moreover, does not claim that his attorney distorted or exaggerated what the Government told him when he reported the conversations and negotiations with the Government representatives (Record of May 23, 1963, pp. 415, 423, 425, 426).

There is no claim that the defendant was induced to plead guilty by means of any coercion or pressure. It is undisputed that the defendant changed his plea from not guilty to guilty voluntarily, knowledgeably and with the comprehensive advice of his attorney (Record of May 23, 1963, p. 429).

## III.

The defendant's attorney and the defendant equivocated between (1) the claim that there had been "representations" by Mr. Londin but no promises; (Schachner, Record of May 20, 1963, p. 31); (2) the claim that there had been "promises" (Schachner, Record of April 26, 1963, pp. 8, 12–13, 14); (3) the claim that there had been neither representations (Schachner, Record of May 1, 1963, p. 37) nor promises but assurances that aroused expectations (Schachner, Record of May 20, 1963, pp. 32–33); and finally, (4) the claim that the defendant's motion should be granted even if there had been no representations.

Thus (Record of 5/23/63, p. 429), Mr. Schachner declared:

"* * * the plea * * * was induced by a variety of practical considerations. It was in part by representations on the part of the Government which may not have risen on [to] the dignity of what should properly be called promises. At least some of them may not have. I do believe, however, that the prosecuting arm of the Federal Government should live up to an ethics higher than that of the witches in Macbeth who hold out promises to the ear and deny it to the hope. I think expectations were aroused. They were aroused very reasonably."

With reference to Londin's statement about the Government's statement to the sentencing judge concerning the defendant's cooperation, Mr. Schachner declared (minutes, 5/23/63, pp. 430–431, 432):

"* * * he said that that was not in the form of a promise; that it was expressly said that nothing could be promised along these lines but that he, Mr. Bolan, could rely on the good faith of the Government."

Defendant's memorandum (filed May 17, 1963), page 3, speaks of "the issue of what *expectations* they [Government

representatives] aroused, what expectations they disappointed and what *expectations* were related to the defendant." (Emphasis added.)

The amorphous character of the defense claims in these respects has required an objective and intensive inquiry into the evidentiary facts.

## IV.

■ To determine whether the defendant should be permitted to withdraw his plea of guilty, the Court will not be governed by the technical concept of "promise" as used in contract law nor by the precise definition of "representation" as used in tort law.

The controlling desiderata by which the evidence is to be appraised are those embodied in the criteria of the fundamental decency of federal criminal justice. This is the main theme that runs through its verbal variations of good faith, fair play, ethical conduct and due procedural regard for the substantial rights of the defendant.

These criteria are to be applied generously in favor of the defendant in order to afford him the full measure of his constitutional and civil rights and privileges.

It is in conformity with the foregoing principles that the Court has evaluated the proofs.

## V.

■ Throughout the hearing, the defense position was that the cooperation expected of the defendant related only to matters "which were then either under indictment or under investigation." (See, e. g., Record of 5/23/63, pp. 459, 463–467, 486, 560; May 24, 1963, p. 714); "The United Dye Chemical"; "And matters relating to that"; "And anything about the persons who were connected with United Dye."

However, even the defendant did admit that Londin told him emphatically that "he expected full cooperation * * * that he expected you [the defendant] to tell the Government everything and anything you knew about United Dye matters and the persons connected with it and anything else in relation to it." (Record of 5/23/63, pp. 467–468.)

In defendant's post-hearing Memorandum In Support of Motion To Change Plea, page 6 defendant's counsel abandoned a restrictive view and finally admitted:

"It is unnecessary to resolve any possible divergency in the testimony on this score. Certainly, *no express limitation was put on the extent of Hughes' cooperation.* It would be quibbling to suggest that the subject matter of the proposed cooperation was narrowly circumscribed by implication. Whatever words may have been used, *the defendant may and should be treated as having promised cooperation on all matters concerning which it is within his power to cooperate."* (Emphasis added.)

Defense counsel claims that there is an issue, "whether it is fair not to permit a defendant to change his plea if *some mysterious something* in the way of testimony is suddenly expected of him or, rather, cooperation, I should say—it wasn't even suggested that that cooperation take the form of testimony" (Record of May 21, 1963, p. 224). (Emphasis added.)

Defense counsel further argues that even "if there had never been made any representations to the defendant," the defendant should be allowed to withdraw his plea "solely because at the time at which he made his plea [of guilty] he could not conceivably anticipate that in some way *an unmentioned something* would be demanded of him as a token of cooperation; * * * that at that time [when he pleaded guilty] nobody could anticipate that *some such vague thing* might come up. * * * if the defendant at the time that he made his plea could merely have guessed that *some such thing*

would develop in later years, he would not have pleaded guilty * * * it is just terribly unfair to a defendant after securing his cooperation in a long and difficult case to trot out this *Kafkaesque suggestion.* * * * it is *an undefined suspicion of cooperation about an undefined something.* * * * the unfair conduct of the Government, even assuming that no repudiation was made, or no representations were made. * * * Unfairness in the sense of first securing from the defendant the cooperation in a long trial, arousing in the defendant the expectation that this cooperation would redound to his benefit, thereby assuring that the defendant would not move for immediate sentence, and then using *something* that no one could have anticipated at the time the plea was changed to guilty in some way to reflect on the defendant and to make his position worse in a manner which he couldn't reasonably anticipate. * * * Meaning to use that incident to attempt to secure a harsher sentence than which he might ordinarily have received. * * * they [the Government]. refuse to define the matter. * * * it is impossible for him to comply with such a request of the Government. * * * [a request that is] unanticipated and impossible. * * * In an impossible predicament" (Record of May 21, 1963, pp. 225, 227, 228, 229, 234, 235, 236, 237, 238, 239. Record of May 23, 1963, pp. 441–442, 447). (Emphasis added.)

The defendant's own testimony describes the subject matter concerning which he was asked to cooperate.

On or about February 12, 1963, defendant met with Assistant United States Attorneys Cohn and Walpin; at first Bolan was present but he left and defendant continued with Assistant U. S. Attorneys Cohn and Walpin (Hughes, Record of 5/23/63, pp. 473–474).

The defendant further testified that, at that meeting, Assistant U. S. Attorney Walpin said that his statement to the sentencing judge "would indicate to the sentencing judge that I [the defendant] had been cooperative or uncooperative and that this statement should indicate their position with respect to what they —how they would like to have my sentence disposed." (Hughes, Record of 5/23/63, p. 519).

The defendant then testified (Record of 5/23/63, pp. 520–521) that he "had been *asked to tell all I [the defendant] know about the facts leading up to the United Dye indictments. And I said I had told them all the facts about that I know.* He [Walpin] said perhaps did I know *more* than I have told and that *would I tell them all the facts.* I said that I had and that if they asked me specific questions I will answer them. They said did I [I did] know exactly what they mean, I said that I didn't * * * then we just sat there for about five—or I don't know how much time and Mr. Walpin said that, in substance, of course, 'You know that your cooperation, the extent of your cooperation will be stated to the duly sentencing court,' and that I should consider that whether I'm being cooperative or not and that if I had anything further to tell them or if I was going to get another lawyer, that his office would always be open and that to be free to communicate with him." (Emphasis added.)

The overwhelming weight of the credible evidence establishes:

1. That the Government representatives informed the defense in effect that an Assistant United States Attorney is obligated candidly to advise the sentencing judge on the day of sentence whether the defendant did or did not cooperate with the Government if the defendant was in a position to cooperate by disclosing pertinent evidence or information in compliance with a reasonable and meaningful request;

2. That the discussions between the Government representatives and the defense encompassed such cooperation with respect to all areas of official concern to the United States Attorney's Office and was not restricted to the so-called UDY case;

3. That the United States Attorney's Office advised the defense that, if the

defendant did cooperate, the extent of such cooperation would be called to the attention of the sentencing judge; that, if the defendant cooperated fully, the United States Attorney's Office would present the pertinent facts of such cooperation without any recommendation but in such a manner as to indicate to the sentencing judge that the United States Attorney's Office was not pressing for a jail sentence; that the nature and extent of any sentence was a matter within the exclusive province of the Court; and that no promise or guaranty of any specific sentence could be given to the defendant;

4. That, so far as concerns the elements necessary for the determination of the present motion, the Government has conducted itself in good faith, fairly and properly in its effort to secure the cooperation of the defendant; and there is no merit to the defendant's claim that the Government has frustrated his opportunity to cooperate.

To permit a defendant who has pleaded guilty to withdraw his plea merely because he and the United States Attorney disagree over the extent to which he has cooperated or is able to cooperate with the Government, in the circumstances of this case, would inject a disruptive element into the judicial administration of criminal justice and create an issue that by its very nature should not be the subject of a plenary hearing.

A full dress trial of a controverted issue whether a defendant, after his guilty plea, has fully cooperated with the United States Attorney in pending inquiries, would require the Court to probe into the executive management of criminal investigations, grand jury proceedings and matters of administrative judgment. Such judicial intervention (including a hearing) presents the substantial risk of premature disclosure of matters under investigation and the consequent impairment of criminal law enforcement.

Unless necessary to promote the proper administration of justice or to safeguard a defendant's rights, the Court should not inject itself into the pre-indictment investigative functions of the United States Attorney.

The question of the nature and extent of a defendant's cooperation with the United States Attorney can and should receive due consideration in the proceedings on the defendant's sentencing. At that time both the defendant and his attorney, as well as the United States Attorney, will be given an opportunity to be heard.

## VI.

The overwhelming weight of the credible evidence establishes:

1. That there was no assurance, promise or representation on the part of the United States Attorney's Office that the defendant would be given the privilege of obtaining one or more adjournments of the defendant's sentencing in Room 318 in order to by-pass one or two judges regarded as undesirable by the defense.

2. That the defendant's guilty plea herein was not induced by any Government assurance, promise or representation relating to adjournments of the sentencing.

3. That the defendant's present claim (Bolan, Record of May 23, 1963, pp. 338–339) that there was a Government assurance, promise or representation that the defendant would be given such a by-passing privilege is a spurious afterthought first announced by the defense in February, 1963, in order to meet the tactical exigencies of the defense.

Contrary to defense counsel's contention (Post-hearing Memorandum, p. 7, submitted by defendant) that "Londin's testimony agrees substantially with that of Bolan," Londin squarely contradicted Bolan in all critically important respects.

Londin's explicit testimony explodes the defense claim that there was an agreement, representation or assurance that the device of adjournments of the sentencing could be used by the defendant,

with the Government's consent, to by-pass sentencing judges deemed "undesirable" by the defense.

Thus, Londin testified that almost immediately *after* Bolan said that the defendant would plead guilty, Bolan inquired, "What if I wanted an adjournment of sentence?" (Londin, Record of May 1, 1963, pp. 58, 65, 117, 118–119).

Londin replied that Bolan "would have to make his application for the adjournment in 318, and if he presented a plausible reason for an adjournment the Government would have no objection * * * to his request for an adjournment for a period of up to one month, and that if at * * * the end of that time, he felt he needed another adjournment he had only to * * * advance a plausible reason to the Court, and the Government would not oppose that request." (Londin, Record of May 1, 1963, pp. 58–59, 65, 88, 107–108, 127).

Londin further credibly testified:

(1) That whether the requested adjournment would be granted would be left "up to the Court." (Londin, Record of May 1, 1963, p. 91a);

(2) That the conversation he had with Bolan about adjournment of the sentencing was not part of the preceding statement by Bolan that his client would plead guilty (Londin, Record of May 1, 1963, pp. 117–118, 119);

(3) That Londin did not tell Bolan that the Government would not object to several reasonable adjournments (Londin, Record of May 1, 1963, p. 126);

(4) That Londin never told Bolan that he could have an indefinite number of adjournments in Room 318. (Londin, Record of May 1, 1963, p. 107);

(5) That at no time did Bolan ever tell Londin, in words or in substance, "that he would or might want to get an adjournment of the sentence of the defendant so that he could by-pass one or two judges who Mr. Bolan felt might treat his client more severely than other judges." (Londin, Record of May 1, 1963, pp. 106, 113–114);

(6) That at no time did Londin ever tell Bolan, in words or in substance, that he (Londin) would consent to an application for an adjournment that Bolan might make in Room 318 "in order to enable Mr. Bolan to by-pass one or two judges who Mr. Bolan felt might treat his client more severely than other judges." (Londin, Record of May 1, 1963, pp. 107, 114);

(7) That (p. 114) "There was no discussion of the subject,"—this being in flat contradiction to Bolan's affidavit and testimony upon the present motion;

(8) That Londin never told Bolan, in words or substance, that "if after the case had been set for sentencing in Room 318 the defendant preferred to have the sentencing adjourned to another judge the following month in Room 318 or sometime thereafter, the government would not have any objection to such an adjournment." (Londin, Record of May 1, 1963, p. 114);

(9) That there was absolutely no discussion between Bolan and Londin about the defendant's preference with regard to judges. (Londin, Record of May 1, 1963, p. 115);

(10) That Londin never told Bolan, in words or substance, "that the government had agreed to permit Hughes not to be sentenced by a judge deemed undesirable from the defendant's standpoint." (Londin, Record of May 1, 1963, p. 115);

(11) That Londin never told Bolan that he could pick the sentencing judge or that he could veto the sentencing judge or that the defendant would be sentenced in the criminal calendar part of this court or that the sentencing would not be referred from the calendar part in Room 318 to another judge. (Londin, Record of May 1, 1963, pp. 87, 88, 93);

(12) That Londin never made any promises to the defendant (Londin, Record of May 1, 1963, pp. 86–87);

484

(13) That there was no "practice" in the U. S. Attorney's Office to permit a defendant who had pled guilty to adjourn the sentence from time to time. (Londin, Record of May 1, 1963, p. 103);

(14) That Londin's recent conversation with defense and Government attorneys were substantially the same as the statements summarized above. (Londin, Record of May 1, 1963, pp. 70, 71, 110);

(15) That Londin never told Assistant U. S. Attorney Walpin that it was his (Londin's) understanding of his discussion with Bolan that Bolan was going to be permitted on application in Room 318 to by-pass one or two judges who may be unfavorable to the defense. (Londin, Record of May 1, 1963, p. 72);

(16) That Londin does not recall meeting Bolan and talking to him about the defendant in the U. S. Court House on February 26, 1963. (Londin, Record of May 1, 1963, p. 66; Stipulation, Exhibit A, Record of May 20, 1963, p. 21);

(17) That—contrary to Bolan's testimony (Record of May 24, 1963, pp. 588, 606–607)—Londin never told Bolan that the referral of the sentencing to this Court was a violation of any understanding between the defense and Government (Londin, Record of May 1, 1963, p. 127; Record of May 24, 1963, p. 624, Exhibit A).

Flatly refuting the defense contention (Schachner, Record of May 23, 1963, pp. 416–417, 419, 434) and Bolan's testimony (Record of May 24, 1963, pp. 665–666),— Londin testified that the words used by Bolan in speaking to him about the adjournment of the sentence did not have a special significance "among Assistant United States Attorneys and experienced practitioners in this court house" (Londin, Record of May 1, 1963, p. 61).

The defendant makes much of the following answer of Londin (Record of May 1, 1963, p. 126): "When Mr. Bolan said supposing he wanted an adjournment, I thought he might have in his mind that he would want to avoid some particular judge, and to me it didn't matter who sentenced him."

Actually, as the record itself plainly states, all that Londin said was that Bolan, in referring to the subject of possible adjournments of the sentencing, "might" be thinking of avoiding some particular judge. This is a far cry from the defendant's current transformation of Londin's answer into an alleged agreement or mutual understanding that the device of adjournments would be used to by-pass sentencing judges deemed "undesirable" by the defense. Indeed, Londin's testimony explicitly negatives any such alleged agreement or mutual understanding and rebuts any contrary argumentative "inference" that the defense now conjures up.

Courtroom experience shows that the adjournment of a sentencing "might" be used by a defendant to serve one or more of a variety of purposes completely unrelated to the personality or penological philosophy or reputation of the sentencing judge; e. g., to enable the defendant to arrange his business or his financial affairs in contemplation of his anticipated incarceration; or, to enable the defendant simply to delay the day of imprisonment; or, to permit the defendant's lawyer to appear in court on a more convenient day, when he is not elsewhere engaged; or, to enable the defendant to attend a child's graduation or some other family function; or, to enable the defendant to create a situation whereby his children may think he is out of town on a business trip in order to keep them ignorant of their father's imprisonment.

The mere possibility that a defendant's attorney "might" be thinking of utilizing an adjournment (to be granted on the basis of an entirely different and ostensibly valid reason to be presented to the Court) in order to "shop" for another sentencing judge does not transmute the Government's normal statement—that there would be no objection to a request for one or two adjournments for which

a plausible reason was presented to the Court—into an extraordinary promise, representation or assurance by the Government that the defendant would have the privilege to by-pass one or two judges deemed too harsh by the defendant and thereby to jockey the sentencing before some other judge more to the defendant's liking.

The convincing character of the Government's evidence that there was no by-passing agreement, representation or assurance is enhanced by the credible evidence that the established policy and practice of the U. S. Attorney's Office are firmly opposed to an arrangement whereby a defendant's attorney would be permitted to obtain adjournments of the sentencing as a stratagem to by-pass or select a sentencing judge. (See, e. g., Bolan, Record of May 24, 1963, pp. 726, 742; Walpin, Record of May 28, 1963, pp. 871, 875–880, 883.)

The Court rejects as incredible Bolan's testimony (Record of May 24, 1963, pp. 582, 742–743) that Londin told him over the phone on or about February 20, 1963, that the privilege of by-passing or selecting a sentencing judge "was such a simple routine matter that was a courtesy that it is always extended to defendants who plead" and that "it was the policy of the United States Attorney's Office to permit this, to permit a by-pass of an unfavorable judge."

The incredibility of Bolan's story is again exposed by its own implausibility. This is pointed up, illustratively, by the correlation of certain salient facts embodied in Bolan's testimony as follows:

Soon after Londin resigned from the U. S. Attorney's Office in June, 1961, Walpin took over the case and met with Bolan and the defendant on or about June 22, 1961. According to Bolan's testimony, at the first meeting of Bolan and Walpin, Walpin discussed "the ground rules". (Record of May 23, 1963, p. 537). In so testifying, Bolan did not refer to the alleged by-passing assurance, agreement or representation.

When specifically questioned by the Court, Bolan added (Record of May 23, 1963, pp. 560–563) that in this meeting with Walpin they discussed the details of the "arrangement with Mr. Londin in accordance with which Mr. Hughes had entered a plea." But they did not discuss "the question of the sentencing judge until February, 1963." Bolan further testified that the matter of Room 318, adjournments of sentence, or the sentencing judge was never mentioned by Bolan or any Assistant U. S. Attorney in the presence of the defendant. (Record of May 23, 1963, p. 563).

Walpin and Bolan are in agreement on the highly significant point that, although they discussed "the ground rules", neither Bolan nor Walpin mentioned the by-passing agreement allegedly entered into by Londin, Walpin's predecessor in the case.

The very first mention by Bolan to Walpin of an alleged by-passing agreement occurred sometime between February 12th, 1963, and February 20th, 1963. According to Bolan, he telephoned Walpin and told him that he (Bolan) would like the defendant to be sentenced "and at that time I [Bolan] told Mr. Walpin that I had this agreement from the government that I would have the right to by-pass an unfavorable judge." (Record of May 23, 1963, pp. 571, 740); "my arrangement with the government is that I have the right to by-pass any undesirable judge." (Record of May 23, 1963, p. 576). According to Bolan, Walpin said nothing in response. (Record of May 23, 1963, pp. 577–578).

If there had been a by-passing arrangement agreed on between Londin and Bolan it would have been mentioned in June, 1961, when Walpin, as the Assistant U. S. Attorney newly assigned to the case, had his first meeting with Bolan and they discussed "the ground rules."

In other respects, Walpin's testimony concerning the first meeting with Bolan in June, 1961, materially impugns the credibility of Bolan's recital of what was

said at that meeting. Walpin flatly contradicted Bolan's testimony that they discussed the details of the alleged prior arrangement with Londin in accordance with which the defendant had pleaded guilty. Walpin testified (Record of May 28, 1963, pp. 861–864) that, at that meeting, there was no conversation about the defendant's change of plea; that there was no reference to any prior conversations between Londin and Bolan; that Walpin did not tell Bolan and the defendant that they would have to rely on the good faith of the Government not to prosecute the defendant on other matters and not to press for a jail sentence.

Walpin further testified (Record of May 28, 1963, pp. 862, 863, 890–891) that he told the defendant and Bolan that he could promise them nothing; that he thought that it was his "obligation as Assistant U. S. Attorney that at the time of sentencing I [Walpin] would inform the sentencing judge of the extent of his [defendant's] cooperation, and I said to him * * * I do not consider this in the nature of a promise, but merely the fulfillment of my obligations as an Assistant U. S. Attorney."

As to the episode in February, 1963, while Walpin confirms the fact that it was not until February, 1963, that Bolan first asserted the existence of the by-passing agreement, representation or assurance, Walpin contradicts Bolan's version of their conversation and the sequence of events.

Walpin testified (Record of May 28, 1963, pp. 867–870) as to the following facts:

(1) That some time in the middle of February, 1963, he telephoned Bolan and advised him that the Government desired (not that Bolan called him and that Bolan desired) to bring on the defendant's sentencing, the exact date to be set; that Bolan thereupon told Walpin for the very first time, "We had been told before that we could get adjournments for a month at a time *in order to allow us to pick the sentencing judge*" (emphasis added);

(2) That Walpin replied, "I am amazed to hear that, and I find it difficult to believe" [not, as Bolan testified, that Walpin said nothing]

(3) That Walpin also said that he would talk to the assistants who had been in the office at the time and also to those who were still in the office to find out what they have to say about it.

Thereafter, Walpin told Bolan that he had checked but could find no one who could corroborate Bolan's claimed right to pick the sentencing judge. (Bolan, Record of May 24, 1963, p. 580; Walpin, Record of May 28, 1963, p. 870). Walpin is corroborated by Londin. Bolan's testimony is incredible.

## VII.

A defense contention relates to the circumstances under which the sentencing was referred by Judge Noonan to this Court on April 26, 1963. The defense argues that the Government "circumvented by a scheme" a promise, by having the sentencing referred to this Court; that the sentencing was "maneuvered" by the Government by having it referred to this Court (Schachner, Record of April 26, 1963, p. 13; Record of May 23, 1963, pp. 437–438); that the referral of the sentencing to this Court deprived the defendant of a "privilege"; that the Government has repudiated "representations made to the defendant and his attorney" (Schachner, Record of May 1, 1963, p. 38; Record of May 21, 1963, pp. 216–217, 234).

The Court has found that there never was an assurance, agreement or representation that the defendant would be permitted to obtain adjournments for the purpose of by-passing or selecting the sentencing judge; and, secondly, the Court has found that the conversation between Bolan and Londin about the possibility of adjourning the sentence was not an inducing cause of the change of plea since it occurred *after* the defense attorney had agreed upon the change of plea (Londin, Record of May 1, 1963, p. 58).

In view of the foregoing, it is immaterial and irrelevant that Judge Noonan, sitting in Room 318, referred the sentencing to this Court upon the application or suggestion of the United States Attorney.

However, in view of the insinuation embodied in the defendant's charge that the referral by Judge Noonan to this Court was the result of some maneuver or scheme, it is appropriate to make some reference to the evidence that dissipates any innuendo of impropriety or irregularity.

The referral by Judge Noonan of the sentencing to this Court was in accordance with routine and regular procedure (Londin, Record of May 1, 1963, pp. 108–109; Walpin, Record of May 28, 1963, pp. 885–887).

United States Attorney Morgenthau testified that he never mentioned the defendant nor discussed the defendant or his case with this Court nor did he ever discuss the referral of defendant's sentencing with this Court or with any other judge (Morgenthau, Record of May 28, 1963, pp. 777, 779–780, 782).

The Court itself, in statements on the record, detailed the circumstances under which the sentencing was referred by Judge Noonan to this Court (Record of April 26, 1963, pp. 18–19; Record of May 1, 1963, pp. 39–40, 48–49; Record of May 28, 1963, pp. 781, 793–798).

### VIII.

The overwhelming weight of the credible evidence establishes:

1. That the defendant pleaded guilty before Judge Metzner on April 3, 1961, because he felt and knew he was guilty and because, acting on the advice of competent counsel, he concluded it was to his own best interest not to stand trial but to attempt to mitigate or extenuate his guilt by agreeing to cooperate with the Government.

2. That neither the defendant nor his attorney has maintained that he is innocent of the charge to which he pleaded guilty (Londin, Record of May 1, 1963, p. 89. Contra: Bolan, Record of May 21, 1963, p. 256; Record of May 23, 1963, pp. 325–326, 329); that on the contrary the defendant admitted his guilt not only by pleading guilty before Judge Metzner but also by reaffirming his guilt in his answer to the specific question put to him by Assistant United States Attorney Walpin in the course of preparing against anticipated cross-examination in the UDY case. (Walpin, Record of May 28, 1963, pp. 866, 892–893. Contra: Hughes, Record of May 28, 1963, pp. 894–895).

3. That nothing was promised or offered to him by the United States Attorney's Office to induce him to change his plea from not guilty to guilty; and that the non-existence of any such promise or offer was specifically and positively affirmed by the defendant's own testimony before this Court (Hughes, Record of 5/28/63, p. 845).

### IX.

A close examination of the record of testimony and exhibits demonstrates convincingly that, on all of the determinative issues, the proofs relied upon by the Government in support of its contentions in opposition to the motion are most persuasive. The Court finds that such proofs are trustworthy and reliable. The Court rejects, as incredible, the evidence relied upon by the defense to establish its version of the material facts.

The defense evidence, in all decisively material respects, was contradicted by the proofs relied upon by the Government, and the ensuing issues of relative credibility are resolved in favor of the Government.

United States Attorney Morgenthau, Chief Assistant United States Attorney Broderick, Assistant United States Attorneys Walpin and Morrison, and former Executive Assistant U. S. Attorney Londin have testified on the hearing herein. The Court accepts their testimony as credible on all material points. To the extent that the defense relies upon contradictory testimony presented by any other witnesses called in behalf of the

defendant, such contradictory testimony is rejected as incredible.

In an attempt to lend an air of verisimilitude to its version of key conversations, the defense utilized certain diary entries and a chronological sequence of events to weave a contrived story of allegedly reconstructed conversations. These conversations, as testified to, which contain varying fractions of the truth but never the whole truth, have been custom-tailored to suit the exigencies of the defense. They are rejected as unworthy of belief.

The sentencing of the defendant had been set down for April 23, 1963. At the request of Mr. Bolan, the sentencing was adjourned to April 29th.

The order to show cause herein was signed on April 26, 1963. Thereafter, the sentencing was adjourned, from time to time, during the course of the hearings on this motion and pending its determination.

Upon the conclusion of the proceedings on this motion, the Court will proceed with the defendant's sentencing.

Whether considered liberally in constitutional terms of due process or similar criteria or in nonconstitutional terms of fundamental fairness of federal criminal justice, the rights and privileges of the defendant have not been violated by the Government.

The totality of circumstances developed at the hearing does not present a sound basis for this Court, in the exercise of its discretion, to permit the defendant to withdraw his guilty plea.

The motion to withdraw the plea of guilty and to enter a plea of not guilty is denied. So ordered.