**UNITED STATES of America, Plaintiff,**

v.

**John Marvin McBRIDE, Michael Allen Worth, Theodore Duane McKinney, and Jill Renee Bird, Defendants.**

**Crim. A. Nos. 82–226–01 to 82–226–04.**

United States District Court,
S.D. Texas,
Houston Division.

April 29, 1983.

Daniel K. Hedges, Ronald G. Woods, Houston, Tex., for plaintiff.

Mike Carnahan, Mack Secrest, John Ackerman, Charles Szekely, Houston, Tex., David Duncan, Durango, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

McDONALD, District Judge.

### I. INTRODUCTION

Defendant Bird has moved to dismiss her indictment on the grounds that it is in violation of the Government's agreement with defendant McBride not to prosecute her. The Government argues that it was induced to enter the agreement by duress and fraud, and that to enforce it would contravene public policy. It also argues that the agreement fails as a contract because of lack of consideration and of performance, and failure of a condition precedent. Defendant Bird, for her part, argues that McBride performed his obligation under the contract in good faith, and that policy considerations mandate the application of contract law and specific enforcement of the agreement.

These are difficult issues. They involve the application of contract doctrine outside the commercial milieu to an agreement between the Government and a criminal defendant in the context of the attempted extortion of a major national oil company. They require the court to weigh competing public policies, in favor of protection of criminal defendants and the public interest in safety. The Court finds that the contract was supported by consideration, and not void on public policy grounds, that McBride performed his side of the bargain, and that although the Assistant United States Attorney Murphy entered the contract under duress, he subsequently ratified it. However, the Court concludes the agreement which Murphy entered is not binding on the United States Attorney in this district. Accordingly, defendant Bird's Motion is DENIED.

### II. FACTS

On September 28, 1982, the president and three vice presidents of Gulf Oil Corporation received a letter announcing that "The Gulf Chemical, Cedar Bayou Plant and one other Gulf facility have been sabotaged." It stated that,

> [i]n excess of 10 explosive charges have been placed within the Cedar Bayou Plant. These charges are both radio actuated and time actuated. The radio charges may be detonated from any point within a twenty (20) mile radius of this facility. The time actuated charges will self-detonate starting 120 hours after 10:00 a.m. on the morning you receive this letter, the time charges will continue to detonate up to seven days after this time.

It stated further that,

> The purchase price to Gulf for the locations and deactivation sequences for the bombs at Cedar Bayou, and one other plant to be discussed, is $15,000,000.00, a fraction of Cedar Bayou's value and annual producing income.

It continued that "a facility other than Cedar Bayou has also been sabotaged," that "[s]hould it be necessary for us to destroy

Cedar Bayou the purchase price for the second facility will be $30,000,000," and that both plants were under periodic observation and the bombs would be actuated if Gulf notified outside authorities or media, or attempted to disarm the bombs.

The letter concluded:

We fully realize that you will use every means possible to find us after your facilities are safe; we accept that risk. However, before you notify outside authorities and media, you may wish to consider the probability of amateurs attempting this same crime, with potentially disastrous results.

In conclusion, when you receive this letter, and as you will realize after you examine the sample bomb, we have the means of instantly destroying two of your major facilities. We are determined to receive from you either fifteen or thirty million dollars; that choice is yours. If we receive neither we will destroy many times that amount worth of Gulf facilities, and simply move on to other of your plants; that choice is ours.

Gentlemen, THE CLOCK IS RUNNING.[1]

The FBI investigated the extortion attempt and on October 1, 1982, arrested co-defendants Theodore Duane McKinney and Michael Allen Worth in Phoenix, Arizona, in the course of arranging by telephone to receive $15,000,000 from a Gulf official. Government agents subsequently traced the plot to Durango, Colorado, arresting Bird, McBride and Justice there on October 3, 1982.

Justice described the origins of the extortion attempt as follows. In early August, 1982, Worth, Justice and McKinney made an exploratory trip to Texas to survey potential targets among facilities at Houston and along the Gulf Coast, including both Cedar Bayou and Port Arthur. They discussed a primary and a secondary target at

that time. (Ju.T. 3608, 54; 115–6).[2] At a meeting one or two weeks prior to the actual placement of the bombs on September 26, 1982, the five co-defendants met at McBride's house to discuss their extortion plans, including the placing of bombs at both the Port Arthur and Cedar Bayou (Ju.T. 168). Justice testified that although the original plan for the extortion attempt "pulsated back and forth" with respect to the number and location of bombs, the defendants finally settled on 5 or 6 bombs (Ju.T. 126–7) and decided that it was not necessary to actually plant 10 bombs at another site, since the threat of ten bombs alone would be sufficient. (Ju.T. 137, 168) Approximately one week before this meeting, McBride tested some explosives on Missionary Ridge northeast of Durango and the test did not work. (Ju.T. 67)

Justice spent most of Wednesday, September 22, 1982, and part of Thursday, September 23, 1982, at Worth's residence in Durango assisting Worth in construction of the bombs, in particular, testing the circuits (Ju.T. 28). The components of the bombs were scattered over two rooms (Ju.T. 33–5), and Justice and Worth moved from room to room to work on them (Ju.T. 91). Justice himself did not know how many component parts had been obtained in Durango (Ju.T. 59). McBride came to the house at one point to deliver toggle switches and stayed for ten or fifteen minutes to talk about the plan and whether the requisite parts would arrive at the store in Durango in time (Ju.T. 75), but he did not stay there for the completion of the bombs (Ju.T. 34, 35). Justice testified that he does not know whether McBride saw all the devices because they were scattered about (Ju.T. 34), but that he believed McBride knew how many were taken to Houston, and that he saw most of the components on the table in the living room. (Ju.T. 82, 127–8, 130)

Worth, Justice and Bird travelled to Houston by automobile. The bombs were

---

1. The letter is set forth in its entirety in the Appendix.

2. The testimony of Murphy (M.T.), Jovick (J.T.), and Justice (Ju.T.) was transcribed and is

quoted in the opinion. The testimony has not been transcribed and is paraphrased rather than quoted.

transported to Houston in an unassembled condition; the casings, the explosives, and the blasting caps were packed separately (Ju.T. 70–1). Worth packed the car before Justice got in it, so Justice did not see the component parts packed. (Ju.T. 72, 152). Justice testified that five freezer dishes of explosives were taken to Houston but did not know exactly how many devices there were (Ju.T. 13). When he reached Houston Justice realized that they had sufficient components for at least five devices. Justice kept part of the explosives in his room at the motel in Houston (Ju.T. 95)

According to Justice, Worth and Justice brought to Houston extra component parts, including 2 to 3 extra cases and "a switch or two" (Ju.T. 89), as substitutions in case any components were faulty. The extra components could also be used for another sixth mock bomb for Port Arthur as indicated in the extortion letter, in the event Gulf did not deliver the 15 million dollars (Ju.T. 169, 174), although if they were, each of the bombs would contain less explosives. However, Justice also testified that placing another bomb would require a trip from Durango to Houston with additional supplies, and that the plan was that the sixth bomb would be built at McBride's house and that McBride would spearhead that effort. Finally, he testified that the idea of a secondary target, as a possibility was not discarded until defendants Justice, Worth and Bird reached Houston, and disposed of the extra explosive materials at a car wash in that city (Ju.T. 169, 175).

It took an hour and a half for Justice and Worth to assemble the bombs. Justice planted the bombs on September 26 but deviated from the plan once he got inside the plant and found it was not possible to place one of the bombs as planned (Ju.T. 73). On Wednesday evening, September 29, 1982, at the Houston motel, Justice heard a television report that five bombs had been located. Worth subsequently flew to Arizona in order to receive the money from Gulf officials, and Bird and Justice drove back to Durango, Colorado, arriving on Friday, October 1, 1982. They went to McBride's residence. There McBride played an audio tape

recording of a television news report of the extortion attempt, twice. Justice's testimony on this tape was ambivalent. He stated, first, that he believed he told McBride at that time how many bombs he had planted and that McBride knew how many bombs he had taken to Houston; he then testified on direct that the television report stated that officials had found five bombs (Ju.T. 49, 78). On cross-examination, however, he testified that he didn't remember precisely what the reporter said, that the female reporter was cut off, but he believed she said they had found five bombs (Ju.T. 79), and that, upon hearing the tape, Justice told McBride, not that he had planted five devices, but that he had planted five bombs "in accordance with the plan". (Ju.T. 81) Finally, on redirect Justice indicated that he did not inform McBride that he had planted five bombs but rather than after Justice heard the taped report that Gulf officials had found "five" devices, he told McBride that they obviously had found all the bombs that defendants had planted, and that McBride responded to him that it didn't make any difference, because the Gulf and FBI officials still believed there were more bombs. (Ju.T. 133, 156–58)

McBride and Bird were arrested by FBI agents on Sunday, October 3, 1982. Shortly after the arrest, McBride stated to an agent that he would give the government everything it needed in exchange for the release and non-prosecution of Bird. When questioned by Undersheriff Bell as to how long they had, McBride responded that they were good until the next day. The agent relayed this offer to Assistant United States Attorney Patrick T. Murphy. Murphy had been contacted by the FBI on Saturday, October 2, 1982. He had not read the extortion letter, but agents had informed him of its contents, specifically of the 120 hour deadline and with Assistant United States Attorney John O. Martin, he calculated that it elapsed around noon Sunday, October 3. He did not know the extent of the involvement of Bird. (M.T. 166, 179, 188, 232). He testified that as a result

he and Assistant United States Attorney Martin felt under pressure:

> We were concerned about the safety of citizens of the State of Texas. We felt that we were kind of in a state of emergency or something. The FBI was certainly very excited about it and Gulf Oil was, and so—we were a middle man trying to negotiate some sort of agreement for the safety of the citizens of Texas.

(M.T. 169). Consequently, they sought to keep McBride "willing and interested to give us this information that would clean up the state of emergency in Texas." (M.T. 174).

Murphy received phone calls from the FBI stressing the urgency of an agreement with McBride (M.T. 178). The agents referred to the extortion letter's threat against another plant, near a major metropolitan area. Mr. Murphy testified that therefore the FBI was "really pushing to get it going," and that he and Martin

> kept thinking of [a] sort of mor[al] responsibility that we had in the event that somebody got hurt and we could have prevented it by reaching an agreement with Mr. McBride. I had never been involved in a situation like this before, which I felt if I didn't take an action as an attorney for the government somebody may really get hurt. It was like a hostage situation.

(M.T. 179).

Murphy testified further that he felt "an extreme amount of pressure" to make a decision that day. (M.T. 179), that it was "one of the most difficult decisions I have ever made," and that he "was getting pressure from both sides to get this thing done right away. I was in the middle." (M.T. 185).

Murphy was informed by Auld, McBride's attorney, that McBride would not agree to give evidence against his co-defendants. Murphy drafted the agreement, rejecting Auld's requested changes in wording, including his request for statutory immunity. He also told Auld that he thought the agreement would be binding on the United

States Attorney in Houston. (M.T. 173, 190).

In stating that he would not have entered the agreement had he known that all the bombs had been found and therefore that there was no danger to people in Texas, Murphy testified on redirect that he and Martin

> felt we weren't acting as attorneys for the government, we were acting as concerned people who had a moral responsibility to try to prevent somebody from being hurt. And if I wouldn't have thought there was any possibility of anybody getting hurt, I certainly wouldn't have entered this agreement . . . because . . . McBride had indicated that he had information about an existing threat and something that was going on. We wanted to clean it up. That was the shadow that covered the whole thing. I wasn't concerned, like you are right now [about] presenting a case in court. I was concerned about somebodies' lives.

FBI agent Brian Jovick, who transmitted McBride's offer to Murphy, also testified that he would not have entered the agreement had he known there were no additional bombs to be found (J.T. 138).

Murphy testified that he telephoned the Assistant United States Attorney's Office in Houston, Texas, because both Colorado and Texas had jurisdiction over the case and he "wanted a coordinated, cooperative decision made in this thing. I didn't want Colorado, the left hand, not telling the right hand what was going on . . . ." (M.T. 186). He spoke to Assistant United States Attorney Longoria. Murphy testified that Longoria "agreed to go ahead with this deal", and that he said that the court would not enforce it because of a duress situation." (M.T. 186–87). Longoria's testimony on the agreement was equivocal. He said that he viewed McBride's offer as coercive, that it seemed to him they were being extorted, and he indicated to Murphy that he believed the agreement was voidable. On the other hand, he testified that he did not express dissatisfaction with approval of the Agreement but, on behalf of the United States

Attorney in Houston, agreed that the agreement was a good idea. He testified that the government was getting something in exchange for something: that the something they were getting was the peace of mind that they would have in knowing that there were no more bombing devices in the refinery; and that the government entered the agreement in good faith. He testified that the government's reputation is only as good as its word, but also that good faith meant that the government would keep its promise all other things being equal, that a lot of factors go into the decision not to prosecute including whether what you're getting is worth it, and that the government weighs the public interest, and in the case of McBride its paramount interest was in seeing that the bombs that were here were disarmed. Longoria concluded his testimony by stating that the government should honor its agreement, assuming it was valid and the government was going to get what it bargained for.

Murphy subsequently talked to James Powers, Chief of the Criminal Division of the United States Attorneys Office in Houston, Texas, who also approved the agreement (M.T. 220–22). With respect to whether he was under duress, Murphy testified that he "[didn't] know if he was duressed," but that he "entered th[e] agreement with McBride in good faith" and "still fel[t] that way about McBride." That Longoria's position, Murphy testified, "was curious to [him] at the time, that he "never considered it duress the whole time." That he "never thought about that, rather that he "just thought [he] was just making another arrangement, an agreement." (M.T. 187).

McBride met with FBI agents Defenbaugh, Jovick and Bell, and discussed the location and number of bombs from 6:41 to 8:22 (J.T. 24). Within the first hour of talks, McBride stated that there were no other bombs outstanding (J.T. 142). According to Jovick, when Defenbaugh informed McBride that only five bombs had been found, McBride expressed surprise, stating that six bombs were supposed to be placed (J.T. 79, 14). He then attempted to identify possible locations of the undiscovered sixth device on a map of the facility which one of the agents had (J.T. 81). After talking to Worth on the phone, McBride stated to agents that he might have tested the sixth device and that he could not remember whether he tested one or two devices. McBride described them in such detail that Defenbaugh concluded that McBride had made the bombs.

Jovick took a written statement which was not required by the written agreement (J.T. 23), but which he required (J.T. 52). In response to questions about the secondary target, McBride stated that the plan was to place ten devices at Port Arthur the same night that the bombs were placed at Cedar Bayou (J.T. 32, 64). On the following day, Jovick sought and obtained McBride's consent to telephone defendant Worth to determine the disposition of bombs originally planned for the Port Arthur facility (J.T. 25, 30). McBride subsequently told Jovick that the bombs were thrown "in the bay." (J.T. 31, 64)

Defenbaugh's interview with McBride began at 6:41 p.m. and continued, with a number of interruptions, until 2:50 a.m., October 4, 1982. McBride described the devices involved in the extortion attempt and their components. He originally stated that six devices were going to be sent to Cedar Bayou. At that point Defenbaugh cut short the interview in order to telephone the FBI and Gulf to inform them that another device might remain at Cedar Bayou. After returning to McBride, Defenbaugh found other FBI agents were going to take him to the Needham Way address in Durango to locate explosives he had identified as existing there. The interview resumed at about 10:00 p.m. when McBride returned. McBride gave Defenbaugh extensive detailed information regarding the construction of the six devices and the origin of their components. McBride described the extortion attempt as his brainchild and stated that he purchased the components from Radio Shack beginning in August 1, 1982, and constructed the bombs about that time. He told Defenbaugh that

the 120 hours (ransom deadline) was not a true deadline but was used because it sounded like a good period of time in which to get Gulf to produce the money.

Defenbaugh testified that during the discussions, McBride determined that he was not positive exactly how many bombs might have actually been placed into the Cedar Bayou facility. He explained that he was positive he had tested at least one of the devices and that another reason he could not recall how many bombs were given to Worth was that he threw away the extra components used during the bomb construction. He stated that he may have thrown two boxes away but stated emphatically that six and only six of the boxes were purchased for use in building the devices. Thus, he could not recall whether he had tested or thrown away one or two boxes. McBride also described the origin and construction of the radio-controlled devices which defendants had planned to place. Defenbaugh testified that he could not determine whether the information McBride provided on the ten devices was true or false. The government, therefore, decided to administer a lie detector test to McBride, and McBride passed it on October 5, 1982. (J.T. 85, 92, 125)

As a result, despite the fact that McBride did not identify any bombs that the government did not already know about, Jovick felt at the time that McBride complied with his agreement with the government, in good faith (J.T. 147–8). Murphy testified that although he was not aware of all FBI investigations because his involvement ended when the prosecution of defendants was transferred to Houston and was not sure how many bombs had been located, he felt McBride met the terms of the agreement and on that basis filed a motion to dismiss the complaint against Jill Bird. (M.T. 180–3) [BX # 3]

On October 5, Murphy was informed by the agents that they were satisfied with McBride's compliance with the terms of the agreement. In deciding whether or not to dismiss the complaint against Jill Bird, Murphy testified that he continued to feel under pressure, more precisely that he

felt somewhat like a long-tailed cat in a room full of rocking chairs. I was really under the gun in this whole thing from everybody, ... [representatives of] the press were calling me and haunting me and found my home number and were chasing me down ... They were very aggressive in the pursuit of this story. They kept saying, "when is she going to be released?", so I finally went down and did it and I drafted this one too.

(M.T. 191).

Subsequently, Murphy did not contact the U.S. Attorney in Houston concerning the decision to dismiss the indictment. Although he was not aware of all the results of the investigation, he filed the motion to dismiss the complaint against Bird because he felt the terms of the agreement had been met. Murphy subsequently began plea bargaining with McBride and offered him a one count information with a maximum of 20 years imprisonment. On October 8, 1982, between 10:30 and 11:00, after meeting with McBride for ten or fifteen minutes, Murphy was informed that Assistant General Jiuliani had decided to prosecute the case in Texas.

### III. THE APPLICATION OF CONTRACT LAW

The parties urge the court to apply contract principles to determine the effect of Assistant United States Attorney Murphy's agreement not to prosecute Jill Bird. This case, however, involves different considerations than do the commercial agreements commonly the subject of contract law. Therefore, the court will first, in this section, analyze the agreement according to principles of contract law [3] and then, in the

---

**3.** The parties did not address choice of law questions. The court is bound by *Erie R.R. Co. v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) to apply the contract law of the State of Colorado, where the contract was executed, and of Texas and any other state where it might be avoided or performed. Finding no significant differences between the contract law of the two states, the court has for the most part applied Colorado and Texas law.

next section, in the exercise of its supervisory responsibility for the administration of criminal justice, consider the effect of the agreement on the indictment brought in this district.

### A. The Agreement

■ Ambiguities in the agreement must be construed against the government, which drafted it. *United States v. Sanderson*, 498 F.Supp. 273, 277 (S.D.Fla.1980). In this case, although McBride initiated the agreement with his offer to give agents everything they needed, Assistant United States Attorney Murphy drafted the agreement in its entirety rejecting the suggestions of defendant's counsel. It provided as follows:

In exchange for your complete cooperation with the FBI in connection with the locating and disarming of all explosive devices related to the extortion attempt directed at Gulf Oil Company, the United States agrees that the complaint presently "pending against Jill Bird will be dismissed and no further prosecution will be instituted against her" as a result of the Gulf Oil extortion transactions.

In order for the agreement to be effective, your cooperation must include:

1. Identification of all explosive devices involved in the Gulf Oil Company extortion attempt.
2. A complete description of each device and specific directions regarding the manner in which each device can be disarmed.
3. The precise location of an existing instrument or equipment which could in any manner be used to detonate any of the explosive devices.

In the event of any person injured or any property is damaged as a result of any explosive devices this agreement is null and void.

The pending complaint against Jill Bird will not be dismissed and the promise not to prosecute Jill Bird will not be effective until all explosive devices are safely located and disarmed and the threat to public safety is ended.

This letter consitutes (sic) the sole agreement between the United States and John McBride and no other promises or representations shall have any force and effect.

McBride's cooperation was thus defined to include the identification and complete description of all explosive devices involved in the extortion attempt, specific directions for disarming each, and the location of existing instruments or equipment that could detonate any devices. Significantly, the agreement does not require McBride to identify only explosive devices at Gulf Oil Company plants or only devices which the Government had not yet located. Neither does it require McBride to locate any particular number of devices. The express conditions for the agreement, stated in the third and fourth paragraphs, are the non-injury of persons and non-damage of property, and the location and disarming of all explosive devices. The clear overall thrust of the agreement on its face is the elimination of a threat to public safety.

On the other hand, the government's promise was in general: that the "United States" agreed that the "pending complaint will be dismissed" and that "no further prosecution will be instituted against her."

### B. Consideration

■ The Government argues first that the Agreement is void for lack of consideration on McBride's part. It argues that McBride, in promising to locate and describe explosives, was not furnishing consideration but merely fulfilling a preexisting duty to refrain from criminal activity. Indeed, a promise to fulfill a duty imposed by law is not valid consideration. 1 Williston, *Contracts* § 132 (3rd Ed.1957). *See e.g., U.S. v. Gorham*, 523 F.2d 1088 (D.C.Cir. 1975). McBride, however, had no duty to provide the Government incriminating evidence. In doing so, he relinquished his rights under the Fifth Amendment to the United States Constitution and thereby suffered a detriment; and he was induced to suffer that detriment by the Government's promise not to prosecute his codefendant. Thus, McBride's promise clearly fits the well-established definition of consideration: a promise to act or forebear that is bar-

gained for and exchanged for a return promise. *Rest. Contracts* (2d), § 71.

The Government, alleging that McBride knew at the time of agreement that all bombs placed at oil facilities had been discovered, also argues that McBride actually had nothing to offer the Government and that this too establishes a lack of consideration. First of all, the consideration specified in the contract is not limited to the identification of additional undiscovered bombs at the Gulf Oil plants but is more general: the identification of all explosive devices connected with the extortion plot. More important, in asserting that "McBride failed to perform his promised consideration, thereby breaching the contract," the Government confuses consideration with the separate principles of performance and fraud.[4] Even if McBride had explicitly promised that he would identify bombs still hidden at the facilities, knowing at that time that there were no more bombs, his promise would nevertheless constitute consideration.[5] Rather, such knowledge on his part would enable the Government to avoid the contract on the ground that, although supported by consideration, the contract was contaminated by fraud, a contention which the Court addresses below. Calamari, *Id.*, § 9–1, p. 261; *but see* 6 Williston § 814 (3rd Ed.1962).

### C. *Performance*

■ The Government argues that it may repudiate the agreement because McBride "backed down" on his promise to locate additional bombs at the Gulf facilities and is guilty of "anticipatory breach." In considering the merits of the Government's argument, it is necessary to return to the

language of the agreement and its purpose as revealed by the surrounding circumstances. As indicated above, the agreement did not explicitly call for information on a particular set of bombs but was more open-ended, requiring full disclosure of all circumstances endangering the public. McBride complied with the agreement, first, by relaying all the information he had on bombs planned for and planted at the Gulf facilities—information which, as it turned out, although was not essential to avoid destruction, but which did enable the Government to bring an end to what it viewed as an emergency situation. In addition, McBride pointed the Government to the stock of explosives in the Needham Street basement and provided additional information on the construction of the bombs and the extortion plot. In doing so, he satisfied the basic purpose of the agreement, the elimination of danger. Thus, the Government sought not only the urgently needed information on bombs set to explode at the plants, but also information on bombs held in reserve which might be used by co-conspirators still on the loose.

■ Because McBride's performance fulfilled the essential purpose of the agreement, the Government is not excused on the ground of breach, from its own performance. The law in Colorado is that rescission will be granted and a contract forfeited only when there has been a major breach that goes to the heart of the agreement, has caused the aggrieved party irreparable injury, and involves more than a mere variance of contract terms. *See Utah International, Inc. v. Colorado-Ute Electrical Ass'n, Inc.*, 425 F.Supp. 1093, 1099 (D.Colo.1976). Nor can the Government repudiate on the

---

4. While Williston suggests that the distinction between consideration and performance is mostly academic, 6 *Williston Contracts* § 814 (3d Ed.1962), consideration is nevertheless understood by most authorities and practitioners as referring to the promise itself and not to whether the promise is ever performed. *See e.g., Harriman, Contracts* § 524 (2d Ed.1901); Calamari & Perillo, *Contracts,* § 11–25, p. 426 (1977).

5. The obscure doctrine of "impossible consideration" applies only where *both* parties know,

on entering the contract, that performance is impossible. *Runyon v. Culver,* 181 S.W. 640, 168 Ky. 45, 51 (1916); *Golden v. Newberry Wrecker Service, Inc.,* 267 S.E.2d 763, 154 Ga. App. 130 (1980) and thus is not applicable here.

Neither is this a case of "impossibility of performance" since that defense to any action for breach of contract requires the occurrence of subsequent, unforeseen events. *Rest. Contracts* (2d), § 261, p. 313.

ground of anticipatory breach, which occurs when a party makes clear, before performance is due, that he will not perform as promised. *See* 11 Williston, *Contracts* § 130, p. 77 (3rd Ed.1968). None of McBride's behavior indicates that he intended to back down at any time: he began to perform promptly after signing the agreement, cooperating in the interview with agents Jovick, Bell, and Defenbaugh, and continued to perform, substantially complying within the first couple of hours, relaying information as it became available to him during the evening and into the early hours of the morning.

### D. *Conditions Precedent*

The Government argues next that it may repudiate the contract because a condition precedent to its performance cannot be satisfied, that "[t]he failure of a condition on which the bargain was expressly or impliedly predicated excuses all parties to the contract from performing." (G. Response, p. 50) Although the Government does not identify the failed condition that allows it to repudiate, the Court surmises that it is the existence, at the time of the agreement, of bombs still undiscovered at Gulf Oil facilities. Again, a look at the agreement and at the law on conditions in Colorado shows that this argument has no merit.

 A condition is an event, not certain to occur, that gives rise to a duty to perform. *Rest. (2d) Contracts*, § 224. Where performance is predicated on such a condition, the non-occurrence of that condition excuses performance. *North Denver Bank v. Bell*, 528 P.2d 413, 414 (Colo.App. 1974); *Rest.* § 225. Yet conditions are not favored under Colorado law, and for per-

formance to be excused, the intention to create the condition must appear expressly or by clear implication. *McMillion v. McMillion*, 522 P.2d 125, 128 (Colo.App. 1974). Nowhere in the agreement at bar is the presence of undiscovered bombs identified as a condition precedent to the Government's performance. Moreover, the agreement already includes a condition subsequent discharging the Government's duty to perform in the event of an explosion.[6] There is no reason, therefore, in order to preserve the essential purpose of the agreement, to find a condition precedent by process of implication.[7]

### E. *Public Policy*

 The government, relying on language from *United States v. Gorham, United States v. Bridgeman*, 523 F.2d 1099 (D.C. Cir.1975), and *United States v. West*, 607 F.2d 300 (9th Cir.1979), argues that the Agreement between Murphy and McBride is void because it is a contract to forebear prosecution and therefore contrary to public policy.

In support of its holding that a prison official's promise not to prosecute rebellious inmates would not be enforced, the court in *Gorham* stated simply, "because bargains involving the forebearance of prosecution are contrary to public policy, [the promise] would have been *nudum pactum.*" *Id.* at 1097. The Court did not explain its reasoning but cited, in footnote 9 of its opinion, 6A Corbin, *Contracts* § 1421 (1963). The same court in *Bridgeman* stated, "[w]ere this agreement to be construed as an absolute immunization from prosecution it would be contrary to public policy and *nu-*

---

**6.** A condition subsequent is an event that terminates a duty to perform. *Rest.* §§ 224, comment e, 230. The condition subsequent in the agreement between the Government and McBride reads as follows:

In the event any person is injured or any property is damaged as a result of any explosive devices this agreement is null and void.

**7.** Moreover, even if its performance were conditional, the Government should have acted sooner to repudiate. Having learned that no

bombs remained to be found at the Gulf plants, the Government continued to elicit information from McBride and proceeded with its own performance, dropping the charges against Defendant Bird and releasing her from custody. In acting on the agreement and accepting benefits under it, the Government waived any right it had to repudiate on the ground of the alleged lapse of the condition precedent. *See Rest.* § 246; *Ziegler v. Hendrickson*, 528 P.2d 400, 403 (Colo.App.1974).

*dum pactum,"* and again cited to Corbin. *Id.* at 1110.

The cited section of Corbin's treatise concerns "bargains for compounding crime or stifling a prosecution." Corbin explains that, "[t]he 'compounding' of a felony was itself a common law crime, and any bargain involving such an offense is necessarily illegal," and that such bargains "are in various forms, including promises not to prosecute or not to give evidence to the prosecuting officers, promises to conceal evidence, and promises to cause the dismissal of a prosecution already begun." Corbin points out that "[b]argains to stifle a prosecution are most commonly made by those who have suffered a tortious injury at the hands of a criminal offender," *Id.* at 357, and the cases that he cites involve agreements between private parties, *see, e.g., Rutherford v. Elliot,* 23 F.2d 250, 253 (6th Cir.1928); and are generally attempted settlements of a civil claims that involve dismissals of related criminal charges, *see, e.g., Shim v. Kikkoman International Corp.,* 509 F.Supp. 736 (D.N.J.1981), *aff'd sub nom., Woohyung Shem v. Kikkoman International Corp.,* 673 F.2d 1304 (3rd Cir.1981).

The public policy that such agreements violate is the encouragement of disclosure of criminal activity. *See, e.g., Lachman v. Sperry Sun Well Surveying Company,* 457 F.2d 850, 853 (10th Cir.1972). Surely the government is not compounding a crime whenever it decides not to prosecute someone. It does not take the position that plea bargaining agreements, which may also include promises not to prosecute, are void as "compounding a crime." Thus, whereas generally the applicability of the law on "compounding a crime" to a governmental grant of immunity is dubious, it is clearly inappropriate in this case where the government, albeit under duress, entered an agreement, precisely in order to obtain information about criminal activity.[8]

## F. Avoidance

### 1. Fraud

The government also seeks to avoid the agreement on the ground that the authorities in Colorado were induced to enter the agreement by McBride's fraudulent conduct. It alleges that McBride knew from extensive media coverage of the extortion event before his arrest and imprisonment that the Government had already discovered five bombs at Cedar Bayou, and that he knew there were no other bombs at Cedar Bayou or any other facility. Thus, argues the Government, McBride knew that there was no immediate danger and also knew from statements by the Government agents who negotiated with him that but for their concern about imminent detonation of the bombs they would not have negotiated with McBride.

It is undisputed that, while the Government wanted all kinds of information from McBride, including the location of the stored explosives, it would not have entered the agreement had it known that all bombs had been disarmed. It is not clear, however, that the Government was induced into its false expectations by McBride's behavior.

Fraud is a species of misrepresentation, defined as "an assertion that is not in accord with the facts," which, if it induces the other party to agree to the contract, is ground for that party's avoidance. *Rest. (2d). Contracts* §§ 159, 164. McBride made no false assertions before signing the agreement, but said merely, "If you get the charges against my wife dropped, I'll give you everything you need." False "assertions" need not be explicit, however, but may be inferred from the

8. The agreement might, however, be considered void and unenforceable because it is in contravention of the interest of the public that the United States Government not be blackmailed, or because it is like a coerced adhesion contract. It seems clear, however, that the agreement between McBride and the government was not in itself in violation of the public inter-

est. Once the government had apprehended McBride, an agreement to obtain information on potential explosive devices, in exchange for Bird's release, in fact furthered the public safety. The defect was not the agreement itself but the circumstances under which the government entered it, *i.e.,* the duress, which is discussed below.

promisor's nonverbal behavior. *Rest.* § 159, Comment a. In Colorado, "fraudulent concealment" is a well-established ground for avoidance. Five elements must be established for the aggrieved party to succeed:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) *knowledge* on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the *intention* that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*Ackmann v. Merchants Mortgage & Trust Corp.,* 645 P.2d 7, 13 (1982) (emphasis added). In the present controversy, the Government has not carried its burden of establishing two of the five elements: McBride's *knowledge* of the allegedly withheld information, and his *intent* to deceive authorities.[9] The testimony, while conflicting, does not show that McBride knew that five bombs had already been found, but rather that until McBride spoke with his co-defendant Mike Worth after the execution of the agreement, he was under the impression that there were undiscovered bombs at Cedar Bayou.

■ That McBride was telling the truth is supported by the testimony of all three of the government officers who negotiated with him that they felt he had acted in good faith. The implication of the testimony of McBride's co-conspirator Timothy Justice, that McBride knew that all five bombs had been found casts doubt on McBride's truthfulness, but it is equivocal on the crucial point of whether McBride actually knew that a sixth bomb was never planted at Cedar Bayou. He conceded that McBride may not have known that he and co-conspirators Worth and Bird had taken only five bombs to Houston, and he was unclear himself as to whether in fact they had packed the component parts for the sixth bomb. Thus, the testimony does not establish that McBride himself had the information he is said to have fraudulently withheld from the Government. Consequently, this Court finds that the agreement not to prosecute was not contaminated by fraud or by any other form of misrepresentation.

## 2. Mutual Mistake

Although the Government does not make the argument, the facts before the Court are more suggestive of the contract theory of "mutual mistake" than of misrepresentation. At first glance, it appears that both McBride and the Government mistakenly assumed, on entering the agreement, that more than five bombs had been placed at Gulf plants.

■ It is well established in Colorado that:

> A party may rescind a contract when, at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is the basic assumption of the contract.

*Beals v. Tri-B Associates,* 644 P.2d 78, 80 (Colo.App.1982), citing *Rest. (2d) Contracts* § 152 (1981). A material fact is one that figures strongly in the inducement to and substance of the contract. 13 Williston *Contracts* § 1544, pp. 94–100 (3rd Ed.1980). The mistake as to the number of bombs planted was clearly material, for the testimony of the Government agents shows that but for their belief that there were more bombs to be found and disarmed they would not have entered the agreement at all.

■ Nevertheless, the Government may not repudiate its agreement on the ground of mutual mistake, because it entered the agreement consciously uncertain as to the

---

**9.** A party may also avoid performing under a contract where the other party has unintentionally misrepresented or concealed the existence of a material fact. But here, too, the party seeking to avoid performance must establish that the other party *knew* of the fact. *Rest.* *Contracts* (2nd), §§ 161, Comment a, 162, 164; *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458, 462 (1937). The government in this case has not established that McBride knew that the government had found all the outstanding bombs.

number and distribution of explosives and the exact nature of the information it would get from McBride. The state court in *Beals* held that parties mistaken as to the course of future events could not rescind for, "[i]ndeed a contract often functions primarily to insulate the parties from uncertainty." *Id.*, 644 P.2d at 80. The Restatement extends the definition of uncertainty to all cases in which the party seeking to repudiate is "consciously ignorant" on entering the contract yet treats his own limited knowledge as sufficient; such a person is said to bear the risk of the mistake. *Rest. (2d) Contracts*, § 154(b) and comments c and d (1981). This broader exception from the doctrine of mutual mistake for uncertainty is adopted by the Colorado Supreme Court in *Halpern v. Dryden*, 154 Colo. 231 (1964), 389 P.2d 590 (Colo.1964):

> Where an alleged mistake of fact is but a contingency which the parties foresaw was liable to arise from their want of personal knowledge, such contingency forming a basis, in part, of the contract, it is not a ground for rescission.

*Id.* 389 P.2d at 593, (citing 12 C.J.S. *Cancellation of Instruments* § 27, p. 978.)

In the case at bar the Government wisely acted on the assumption that additional bombs were set to explode at the Gulf facilities. Nevertheless it entered the agreement conscious of its own uncertainty as to the existence and number of such bombs and thus chose to make an open-ended request for information rather than to specify the information it needed most. Consequently, the Government bore the risk of its own uncertainty and may not now repudiate the agreement because the exchange was not as valuable as it had hoped.

### 3. *Duress*

The Government also urges as a ground for avoiding its agreement with McBride that it entered the agreement under duress "in order to save thousands of lives and billions of dollars from the imminent destruction of the Gulf plants (one in a metropolitan area) and the threatened destruction of many times that amount." (G's Re-

sponse, p. 6) It cites cases of prison uprisings in which federal courts have held agreements by the Government to forego prosecution against individuals, in exchange for the release of hostages, to be voidable for duress. *United States v. Gorham*, 523 F.2d 1088, 1094 (D.C.Cir.1975); *United States v. Bridgeman*, 523 F.2d 1099, 1110 (D.C.Cir.1975); *United States v. West*, 607 F.2d 300, 303–304 (9th Cir.1979).

In *Gorham*, "[t]he DC Corrections Director was compelled by threats and by physical violence which ultimately sent him to the hospital to sign an agreement not to take retributive action against prisoners involved in that uprising." The agreement promised "no reprisals of any kind" and no "court action against any of the inmates involved . . ." *United States v. Gorham*, at 1094.

The court held that the Corrections Director had not promised inmates immunity from prosecution, and that he and the district court which ordered, in a civil case involving conditions at the jail, that no action to injure or harass inmates be taken by officials because of action arising out of the disturbance, did not have the authority to preclude the United States Attorney from prosecuting the inmates because the inmates did not come within the purview of federal statutes authorizing immunity to witnesses. The court added that its "conclusion [was] further buttressed by elementary principles of contract law . . ." including that "a promise that prosecution would not ensue . . . would have . . . been voidable because of inducement by duress." It cited 5 Williston, *Contracts* § 1605 (rev. ed. Williston & Thompson 1937), for the proposition that,

> [t]he tendency of the modern cases, and undoubtedly the correct rule is that any unlawful threats which do in fact overcome the will of the person threatened, and induce him to do an act which he would not otherwise have done, and which he was not bound to do, constitute duress. . . .

In *Bridgeman*, involving the same rebellion the Court of Appeals relied on its earli-

er conclusions in *Gorham* holding that, among other contractual defects, "[t]he promise [the Director of Corrections] offered in exchange was secured through the most patent sort of duress and thus was voidable." *United States v. Bridgeman,* 523 F.2d at 1110.

Similarly, in *United States v. West,* 607 F.2d 300 (9th Cir.1979), inmates attacked, bound and gagged two prison guards and demanded that prison officials provide them with a car for escape. The associate warden refused to negotiate until the hostages were released, but a few hours later agreed to amnesty and safe conduct for all involved if the hostages were freed unharmed. The hostages were freed and the inmates returned to their cells. The district court, relying on *Gorham,* held the agreement was not binding on the government because it was induced by duress, refusing to admit evidence presented by the prisoners that the offer of amnesty was not made under duress. The Court of Appeals upheld the lower court, noting that even though the associate warden testified that the inmates had never told him they would harm the hostages unless amnesty was granted, nevertheless "in light of such threats made in connection with other demands it is clear that under the circumstances such a threat was understood." *Id.* at 304, n. 3.

The prison uprisings in these cases involved an immediate form of physical duress on an individual government official. McBride's case presents a distinctly different set of facts: the narrow context of the contract was that the United States, represented by Assistant United States Attorney Murphy, felt pressured to enter a contract with a single individual whom it held in custody and who offered, without any threat of harm to FBI agents, Assistant United States Attorney Murphy, or anyone else, to provide information in exchange for the release of his wife. McBride did not threaten the Government that the plot would go through as planned unless it promised not to prosecute Bird; he said simply, "If you let Jill go, I'll tell you everything I know."

However, the broader context,—an extortion attempt communicated by a letter (set forth in Appendix A) which threatened immediate and extreme physical harm to numerous individuals as well as economic harm by the destruction of property, through time actuated explosive charges which were due to self-detonate—gave the government little choice but to accept McBride's offer.

Duress has generally been defined to include:

> threats of personal injury, . . . threats of destroying, injuring, seizing land or other things, . . . or any other wrongful acts that compel a person to manifest apparent assent to a transaction . . . or cause such fear as to preclude him from exercising force, will and judgment in entering into a transaction.

13 Williston, *Contracts* § 1603, p. 661–3 (3rd ed. Williston & Jaeger 1970). In addition,

> [t]he test is subjective and the age, sex, capacity, relation of the parties, and all the attendant circumstances must be considered. This follows the analogy of the modern doctrine of fraud which tends to disregard the question of whether misrepresentation were such as would have deceived a reasonable person, . . .

(emphasis added). *Id.* at 669. Williston at § 1605, p. 670–1, quoting *Lewis v. Fahn,* 113 Cal.App.2d 95, 247 P.2d 831, 834 (1952), as leading precedent, which quoted 17 Am. Jur., *Duress & Undue Influence,* 882–885,

> duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The means used to produce that condition, the age, sex, state of health, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his willpower.

Williston, at section 1604, states that "the facts must indicate that [the party claiming duress] was actually induced by the duress . . . to give his consent and would not have done so otherwise." *Id.* at 664.

■ The courts in Colorado have adopted the rule that

> To establish duress as ground for the avoidance of a contract, ... it is not alone sufficient to show the exertion of pressure by threats or even by physical compulsion, but it must also clearly appear that the force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took ....[10]

*Wiesen v. Short,* 43 Colo.App. 374, 604 P.2d 1191 (Colo.App.1979), quoting *Hastain v. Greenbaum,* 205 Kan. 475, 470 P.2d 741, 747 (1970).

■ The conduct of the Defendants, including McBride, in sending the extortion letter to Gulf Oil and planting bombs at the Gulf facilities, clearly constituted duress. It unequivocally threatened both loss of life and destruction of property. The testimony of Assistant United States Attorneys Murphy, Longoria and Powers was that the Government felt compelled to assent to the agreement with McBride as a result of the extortion letter, and that none of them would have entered into the agreement if they had not believed the letter that bombs remained to be found at the Gulf facilities. Agents Jovick and Lisotto testified to the same motivation. The source of their belief was the letter and the results of the investigation which it set in motion.

The object of the threats in the letter was Gulf Oil Company and indirectly Texas citizens. The fact that a third person, Gulf and Texas citizens, was threatened does not detract from the duress. *See* 13 Williston,

*Contracts* §§ 1602, 1622A, pp. 657, 769. In this case, the government represented the interests of threatened Texas citizens. Although the threats in the letter were made, not with the intent of procuring Bird's release, but rather with the aim of procuring 15 or 30 million dollars, it is clear that the original threats continued to exist at the time McBride negotiated the agreement with the government, and that he continued to benefit from those threats.[11]

Where duress is alleged, the Court is compelled, as the Court of Appeals did in *West,* to view the defendant's actions in light of other threats, to determine whether under the circumstances a threat was understood, to look at "all the attendant circumstances." *See,* 13 Williston, § 1603, at 669. McBride's earlier threats against people and property shaped his dealings with the government. To enforce the resulting agreement simply because the magnitude of the impact of the original extortion letter enabled McBride to adopt a cooperative and benign attitude toward officials once he was in custody, would be to permit him and Defendant Bird to profit from their earlier criminal behavior. The duress Mr. McBride intended to cause and did cause Gulf Oil and indirectly American citizens, compelled the Government to draft and sign the non-prosecution agreement. Therefore, the Court concludes that the agreement is voidable for duress.

### 4. *Ratification of Duress*

■ Bird argues that even if the government entered the agreement under duress, it ratified the contract when it dis-

---

**10.** The court continued that

> it is a general rule that a transaction cannot be held to have been induced by duress, notwithstanding any threats which may have been made, where the party had and took an opportunity for reflection and for making up his mind, and where he consulted with others and had the benefit of their advice, especially where he was advised by his counsel.

*Weisen v. Short,* 43 Colo.App. 374, 604 P.2d 1191 (Colo.App.1979) *quoting Hastain v. Greenbaum,* 205 Kan. 475, 470 P.2d 741, 747 (1970).

This language reflects the incongruity of the traditional concept of duress in the context of an agreement by a United States Attorney not to prosecute a criminal defendant.

**11.** An illustration of the benefit which McBride derived from the government's state of mind created by the letter, is that when Undersheriff Bell asked McBride how long the government had, and McBride responded that they were good until the next day, the agents inferred, under the circumstances, that the bombs would be detonated if the Government did not comply with his request by the next day.

missed the complaint against Jill Bird. The essential elements of ratification are the removal of duress and an intent to ratify. *See e.g. Barnett v. Wells Fargo Nevada Nat'l Bank,* 270 U.S. 438, 46 S.Ct. 326, 70 L.Ed. 669 (1912); *Green v. Hopper,* 278 S.W. 286, 287 (Tex.Civ.App.—Eastland, 1925). Ratification may be manifested in one or more of several ways: a party may ratify, first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it. *See Gallon v. Lloyd-Thomas Company,* 264 F.2d 821 (8th Cir.1959); *Carter v. Couch,* 84 F. 735 (5th Cir.1897); (deed to Texas lands made to discharge indebtedness, under duress of imprisonment, was ratified when donor delayed ten years before bringing action for false imprisonment); *Barnett v. Wells Fargo Nevada Nat. Bank,* 270 U.S. at 445–6, 46 S.Ct. at 328–29 (1926) (failure of the party under duress to act for more than three years to disaffirm and reliance on that in action by parties whose rights would be divested by disaffirmance); *Yingling Aircraft, Inc. v. Budde,* 208 F.Supp. 773, 776 (D.Col.1962) (in action on notes given in connection with the purchase of an airplane, a defendant's repeated affirmances of the contract by retaining the airplane, exercising dominion over it, and participating in the sale of it, had "the legal consequence of loss of power of avoidance.")

In the instant case, the duress ended when the government, on October 5, 1982, determined, following the administration of a polygraph, that McBride had fulfilled his obligations under the contract. The government released Bird, and Assistant United States Attorney filed that day a Motion to dismiss the complaint against Bird [BX # 3] which stated

> in order to assure that any threat to the public safety had ceased, the United States agreed to dismiss the complaint against JILL BIRD in exchange for certain information to be provided by others. that information has now been provided and evaluated, and it appears that such a threat no long exists. Accordingly, the United States in fulfillment of its obligation under said agreement, requests dismissal of the complaint against JILL BIRD.

The government neither accepted benefits under the contract [12] nor remained silent after the duress was removed. However, Assistant United States Attorney Murphy did intentionally affirm the contract by performing under it in dismissing the complaint. That it was Murphy's intent to affirm the contract is clear from language of his motion.[13]

## IV.

## EFFECT OF THE AGREEMENT ON THE INDICTMENT IN THIS DISTRICT

Having found that Assistant United States Attorney Murphy ratified his agreement with McBride by performing under it after the duress was removed, the remain-

**12.** Defendant argues that the Government received benefits when it took McBride's statement and searched and seized evidence at the Needham Way address. At that time, the duress had not been removed.

**13.** Courts have held that "ratification, in order to bind a party, must consist of acts taken by the injured party with full knowledge of the facts." *Green v. Hopper,* 278 S.W. 286, 287 (Tex.Civ.App. 0 Eastland, 1925). *See Rourke v. Garza,* 530 S.W.2d 794, 805 (Tex.1971) (parties alleged to have ratified must have knowledge of all material facts.) Here, Murphy testified that when he entered the agreement he "really

didn't know the extent of [Bird's] involvement," and that he did not, when he filed the Motion to Dismiss the indictment against Bird, have the results of all FBI investigations, or the benefit of Justice's statements. Bird's culpability, however, has no bearing on the issue of duress. And, there is no question that Murphy, of all people, knew all the facts material to duress. Moreover, by the next day, October 6, 1982, the government obtained Justice's testimony, and Murphy, rather than acting to disaffirm the contract, proceeded to negotiate a plea bargain with McBride.

ing question for the Court is whether that agreement requires the dismissal of the indictment against defendant Bird in the Southern District of Texas.

Defendant Bird urges that the application of contract principles requires enforcement of the agreement by this court. She relies on the fact that United States Supreme Court has applied principles of contract law and in requiring the enforcement of plea bargains. Noting that " 'plea bargaining' is an essential component of the administration of justice" and "to be encouraged," *id.* 404 U.S. at 260, 92 S.Ct. at 498, the court stated:

> This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

*Santobello v. New York,* 404 U.S. 257, at 261, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971).[14]

▮▮▮▮ The application of contract principles to agreements by the government derives from the court's supervisory responsibility for the administration of criminal justice, *McNabb v. United States of America,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943). It is not automatic but depends on whether it will further public policy. As stated by the District Court in

*United States v. Lieber,* 473 F.Supp. 884 (E.D.N.Y.1979), in discussing plea bargains,

> the question of whether principles of contract law should be applied to plea agreements turn[s] on public policy considerations. It would be inappropriate for the criminal law to totally embrace principles of contract law ... *The purpose to be served,* [in that case] i.e., the encouragement of dispositions through plea agreements, is not lessened if the remedy [of specific performance, for example] is not available to the Government. We believe *that contract principles need be adopted insofar as their utilization will "insure the defendant what is reasonably due in the circumstances."*

*Id.* at 891, quoting *Santobello* (emphasis added). Similarly in *Acosta v. Turner,* 666 F.2d 949, 958 (5th Cir.1982), which involved an agreement between defense counsel and the trial court regarding defendant's competency to stand trial, the United States Court of Appeals for the Fifth Circuit, in requiring enforcement of promises by the trial courts was guided by the relevant policy considerations. It held that because competency to stand trial is of fundamental importance to the criminal justice system, the "proper administration of criminal justice and principles of due process therefore require no less adherence to the state's agreements in this context than in the area of guilty pleas."

▮▮▮▮ This case involves not a plea bargaining agreement but a prosecutor's promise not to prosecute one defendant in exchange for cooperation by another defendant.[15] The power to prosecute and to

---

**14.** *See also Johnson v. Beto,* 466 F.2d 478, 480 (5th Cir.1972), ("plea bargaining is an accepted folkway of our criminal jurisprudence onto which some but not all contract criteria will be superimposed."); *United States v. Hughes,* 223 F.Supp. 477, 480 (S.D.N.Y.1963), (where the Court held it would not be governed by the technical concept of 'promise' as used in contract law .... [T]he controlling desiderata by which the evidence is to be appraised are those embodied in the criteria of the fundamental decency of federal criminal justice. This is the main theme that runs through its verbal variations of good faith, fair play, ethical conduct and due procedural regard for the substantial

rights of the defendant. These criteria are to be applied generously in favor of the defendant in order to afford him the full measure of his constitutional and civil rights and privileges.)

**15.** The fact that the agreement between McBride and Murphy was a third-party beneficiary contract, for the benefit of Jill Bird, does not alter the court's analysis. This case does not, for example, involve the issues in *United States v. Nuckols,* 606 F.2d 566, 569 (5th Cir. 1979), where the court held that guilty pleas "made in consideration of lenient treatment as against third persons pose a greater danger of coercion than purely bilateral plea bargaining

grant immunity from prosecution resides in the legislative and the executive branches of the government. Thus, a formal grant of immunity from criminal prosecution in the federal system can only be made by the Attorney General of the United States with approval of the court pursuant to express statutory authorization, 18 U.S.C. §§ 2514; 6001, *et seq.* The courts have no independent authority to bestow immunity. *See, e.g., United States v. Gorham,* 523 F.2d 1088, 1096 (D.C.Cir.1975). *United States v. Carter,* 454 F.2d 426 (4th Cir.1972). In this case, McBride's attorney requested, but was denied, statutory immunity for defendant Bird.

 Nevertheless, courts have held prosecutors to informal promises of immunity made in exchange for guilty pleas or the cooperation of a defendant either in the exercise of the court's supervisory power over the administration of criminal justice, or alternatively on the basis of the doctrine of "equitable immunity." For example, in *United States v. Paiva,* 294 F.Supp. 742 (D.D.C.1969), in considering dismissal of an indictment brought in breach of an agreement between defendant and the United States Attorney, the court stated that "the judiciary may exercise supervisory powers which affect the executive" and that immunity from prosecution had been granted in entrapment cases, for example, " 'to deter blatant government misconduct ... to protect "the purity of the Government and its processes." ' " The court reasoned that

when the conduct of an officer of the executive branch becomes enmeshed in the judicial process, the courts have the power and resulting duty to supervise that conduct to the extent it uses the judicial administration of justice .... [I]f, after having utilized its discretion to strike bargains with potential defendant, the Government seeks to avoid these arrangements by using the courts, its decision so to do will come under scrutiny. If it further appears that the defendant, to

... [since] threats to prosecute third persons can carry leverage wholly unrelated to the va-

his prejudice, performed his part of the agreement while the Government did not, the indictment may be dismissed.

*Id.* at 747 (emphasis added).

Other courts have relied on the doctrine of "equitable immunity" which derives from *The Whiskey Cases,* 99 U.S. 594, 25 L.Ed. 399 (1878). There, the Supreme Court held that although defendants could not by law plead an agreement by the district attorney that if they testified in behalf of the United States and pled guilty to one count of a pending indictment, then no additional charges would be brought against them, in bar of any indictment against him, they had an equitable title to the mercy of the Executive," and the court could receive applications to postpone trials in order to give defendants time to apply to the executive for immunity. The doctrine has been subsequently modified and used interchangeably with the doctrine of the court's supervisory powers. *See e.g. United States v. Donahey,* 529 F.2d 831, 832 (5th Cir.1976). *United States v. Sanderson,* 498 F.Supp. 273, 276 (S.D.Fla.1980). The United States Courts of Appeals for the Fifth Circuit, although it has not applied the doctrine of equitable immunity to dismiss an indictment, has indicated that it might do so in appropriate circumstances. *See United States v. Weiss,* 599 F.2d 730 (5th Cir.1979), (where the court held there was neither a plea bargain nor "promises held out to which the government, as a matter of fair conduct, might be bound", *id.* at 738, and noted in dicta that an immunity agreement which was not in compliance with statutory procedures would not necessarily be unlawful since (1) a court might hold prosecution in the face of a promise not to prosecute a clear abuse of prosecutorial discretion; (2) defendant's cooperation might be the basis for equitable immunity; or (3) the government's conduct might be so egregious as to constitute a violation of due process. *Id.* at 735 n. 9); *United States v. d'Apice,* 664 F.2d 75, 78 (5th Cir.1981), (where the court held

lidity of the underlying charge."

that defendant's conclusion that a prosecutor's promise of immunity was of dubious value and not co-extensive with his Fifth Amendment privilege was reasonable given the court's prior decisions, but noted that "in a different case, a prosecutor's non-statutory immunity may be held enforceable.")

It is clear that the court's supervision of the fair administration of criminal justice is not limited to protection of defendants, however, and that fairness is a two-way street and may well require prosecution rather than the immunization of criminal defendants. In *United States v. Cowan*, 524 F.2d 504 (5th Cir.1975), the Fifth Circuit affirmed the power of the district court under Rule 48(a) of the Federal Rules of Criminal Procedure to supervise the termination of an on-going prosecution. In denying the prosecution's motion for leave to dismiss an indictment, the court stated that

> the history of the Rule belies the notion that its only scope and purpose is the protection of the defendant .... we think it manifestly clear that the Supreme Court intended to clothe the federal courts with a discretion broad enough to protect the public interest in the fair administration of criminal justice.

*Id.* at 512.

Thus, whether characterized as "equitable immunity" or an exercise of the court's supervisory powers, this Court has the responsibility, not to automatically enforce the contract between McBride and Murphy, to bar the prosecution of Bird, but to subject to scrutiny the decision of the Assistant United States Attorney in Houston to prosecute Jill Bird in the face of the agreement by the Assistant United States Attorney in Denver not to prosecute her. Having scrutinized that decision, the court finds that enforcement of the agreement to bar prosecution of defendant Bird in this district would not deter government misconduct or serve any public policy. To the contrary, public policy mandates non-enforcement of the agreement.

The courts have asserted the public interest in holding the government to its word in cases of agreements not to prosecute which

were entered fairly. In *Rowe v. Griffin*, 676 F.2d 524, 528 (11th Cir.1982), for example, an FBI informant who accompanied Ku Klux Klan members when they killed a woman during the Civil Rights March from Selma to Montgomery, Alabama, in March 1965, aided the FBI in investigating the crime. He was assured immunity from prosecution by the Alabama Attorney General and the FBI in exchange for his testimony against the Klansmen before state and federal grand juries and in state and federal trials, and was subsequently relocated and given a new identity. Thirteen years later, upon the receipt of new information, a local Alabama District Attorney obtained an indictment for murder against Rowe. The United States Court of Appeals for the Eleventh Circuit enjoined the prosecution of defendant by the state and stated that the contractual analysis utilized in *Santobello* "applie[d] equally well to promises of immunity prosecution when such a promise induces a defendant to waive his fifth amendment rights by testifying ... or to otherwise cooperate with the government to his detriment, due process requires the prosecutor's promise be fulfilled."

In *United States v. Carter*, 454 F.2d 426 (4th Cir.1972), the Court of Appeals for the Fourth Circuit held that the government was bound by the terms of its promise to a defendant that he would not be prosecuted anywhere else, a promise which the defendant relied upon in incriminating himself and others, and it stated that the fact that agreement was made in the District of Columbia and breached in Eastern District of Virginia was a "distinction without a difference." The court wrote:

> The United States government is the United States government throughout all of the states and districts. If the United States government in the District of Columbia, acting through one of its apparently authorized agents, promised that the sole prosecution against defendant would be the misdemeanor charge in that jurisdiction, and defendant relied on the promise to his prejudice we will not permit the United States government in the

Eastern District of Virginia to breach the promise.[16]

*Id.* at 424.

In each of these cases, the agreement was induced by the Government and it was entered fairly and was without defect. Thus, the *Carter* court quoted *United States v. Paiva,* 294 F.Supp. 742 (D.D.C.1969), to the effect that the court would enforce an agreement which the government entered "after having utilized its discretion, to strike bargains with potential defendants ...." And in *Santobello,* on which *Rowe* relied, the court wrote that the considera-

tions which favor the use of plea bargaining "presuppose fairness in securing agreement between an accused and a prosecutor," and that absent fairness "a court may reject a plea in exercise of sound judicial discretion." *Santobello,* 404 U.S. at 261–62, 92 S.Ct. at 498–99.

The facts presented by the instant case are strikingly different from those in *Santobello, Rowe* and *Carter,* and they raise a different public policy. This court has found that, far from inducing defendant to enter the agreement, the Assistant United States Attorney Murphy was himself in-

---

**16.** In a similar vein, in *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the Court noted in response to the government's argument that the inadvertent breach of one prosecutor's promise by another prosecutor was immaterial, that "the staff lawyers in a prosecutor's office have the burden of letting the left hand know what the right hand is doing or has done. That the breach of agreement was inadvertent does not lessen its impact." *Id.* at 262, 92 S.Ct. at 499.

"[T]he breadth of respect that the principles of due process require one district of the United States Attorney's office to accord promises by attorneys in another district," *United States v. Papa,* 533 F.2d 815, 824 (2d Cir.1976), appears to be an unsettled question.

Thus, the United States district court in *United States v. Boulier,* 359 F.Supp. 165 (E.D.N.Y. 1972), *aff'd on other grounds sub nom United States v. Nathan,* 476 F.2d 456, 459 (2d Cir. 1973) where defendant made fraudulent representations to the government in exchange for the dismissal of an indictment pending in another district and then failed to cooperate, stated that the United States Attorney in one district had no jurisdiction, power or authority over that pending indictment and therefore, could not agree to dismiss it. The Court found a lack of actual authority, because the attorney in the first district was not authorized to speak for the United States Attorney in the second district; a lack of apparent authority based on statutory authorization for the United States Attorneys, 28 U.S.C. §§ 519 and 545, the regulations of the Attorney General of the United States and the practice limiting United States Attorneys' authority, and that unauthorized actions of a United States attorney outside a particular district would deny the United States Attorney for that district the right and duty to prosecute crimes in the district. Finally, the Court noted that the court's discretionary authority to dismiss indictments under R. 48(b)

would be impaired if the court were "compelled to legitimize such agreements."

The Court of Appeals for the Fifth Circuit relied on *Boulier* in *Dresser Industries v. United States,* 596 F.2d 1231, 1236 (5th Cir.1979), a civil action by a company against the Department of Justice and the SEC, holding a contract between plaintiff and the SEC was not binding on the Department of Justice on the grounds of lack of actual authority. The Court reasoned that "If the rule were otherwise, a minor government functionary hidden in the recesses of an obscure department would have the power to prevent the prosecution of a most heinous criminal simply by promising immunity in return for the performance of same act which might benefit his department." *Id.* at 1236. A court in this district in *United States v. Martin,* 480 F.Supp. 880, 885 (S.D.Tex.1979), has distinguished criminal cases stating that "[i]t would be a complete abdication of court's supervisory duty to allow the government to rely upon distinctions between express, implied and apparent authority among its agents in avoiding the effect of its promise," *See also In Re Doe* 410 F.Supp. 1163, 1166 (E.D.Mich.1976).

In the case of McBride's agreement with Assistant United States Attorney Murphy, Murphy was apparently aware of the teaching of *Santobello* that the left hand keep in touch with the right hand because he contacted Longoria precisely for that purpose. However, although Assistant United States Attorney Longoria in the Southern District of Texas was aware of Assistant United States Attorney Murphy's intention to enter the agreement, Longoria expressed the view that it should be voided on the grounds of duress. In addition, Murphy was not authorized by any one in any United States Attorney's office or the Department of Justice to ratify the voidable agreement. Thus, even if the agreement had not been entered under duress there is a strong argument that Murphy's agreement would not bind the United States Attorney in this district.

duced to contract with defendant by threats of violence, endangering thousands of lives and millions of dollars worth of property. Murphy's action was obviously not the calm exercise of discretion. The agreement, unlike agreements in the other cases, was entered under duress and consequently voidable, and the court's concern, therefore, is not, with protection of defendant in the face of an overpowering government or with government misconduct but, to the contrary, for the public safety and protection of a government of laws in the face of violence.[17]

In other cases of agreements with defendants which the government entered under duress created by acts of violence, courts have not considered "equitable immunity". *United States v. Gorham,* 523 F.2d 1088 (D.C.Cir.1975); *United States v. Bridgeman,* 523 F.2d 1099 (D.C.Cir.1975); *United States v. West,* 607 F.2d 300 (9th Cir.1979). In these cases of void or voidable agreements, the courts have refused to carve out an exception to the statutory prescriptions on the grant of immunity, and have distinguished *Santobello* as a case in which "mutually binding promises [were]

freely given in exchange for valid consideration." *United States v. Bridgeman* 523 F.2d at 1110.

It is clear that an individual may not, by threatening innocent citizens, extract a promise from that government and then use the courts to immunize himself or anyone else from prosecution. In the exercise of the court's supervision over the criminal justice system, "[p]ublic confidence in the fair and honorable administration of justice upon which ultimately depends the rule of law, is the transcending value at stake." *Sherman v. United States,* 356 U.S. 369, 380, 78 S.Ct. 819, 824, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring). To enforce the agreement with McBride would effectively ratify the defendants' illegal actions rather than uphold the rule of law.[18]

The court concludes that Assistant United States Attorney Murphy's agreement with McBride does not bar the prosecution of defendant Bird in this district.[19] Accordingly, her Motion to Dismiss the Indictment should be and is hereby DENIED.

The clerk shall file this Order and provide to counsel for all parties.

---

**17.** *See, generally,* Westen & Westin, "A Constitutional Law of Remedies for Broken Plea Bargains." 66 Calif.L.Rev. 471, 528–539 (1978). In arguing in favor of "Constitutional protection for a defendant's expectation interests ... consistent with or basic intuitions of fundamental fairness," *Id.* at 528, they note that the enforcement of a promise by the government depends on questions of authority and duress, and that with respect to illegal prosecutorial promises (for example where the prosecutor has no legal authority to deliver what he has promised), the relevant considerations are " 'the degree of the offense, the extent of the public harm that may be involved, and the moral quality of the conduct of the parties in the light of prevailing mores and standards of the community' " (quoting 6A A. Corbin, Contracts § 1534, at 816 (1964)) and also "the relative culpability of the parties to the agreement" (citing J. Calamari and J. Perillo, The Law of Contracts, at § 22–12 (2d ed. 1977)). *Id.* at 531–32.

**18.** Defendant Bird argues that the government's refusal to allow her attorney to appear before the grand jury to explain the agreement between McBride and the Assistant United

States Attorney Murphy renders the indictment defective. The transcript of the grand jury proceedings, however, which the Court reviewed at the request of defendant Bird, reflected that the agreement was fully divulged to the grand jury. Moreover, the grand jury appeared as spectators in this Court during the hearing on defendant Bird's Motion for a Protective Order to enjoin the United States Attorney for requesting an indictment of Bird by the grand jury. It is crystal clear that the grand jury was fully aware of the contents of Murphy's agreement and of his dismissal of the complaint against Bird, and that based on evidence offered, it rendered an indictment against defendant Bird. There is no evidence of prosecutorial misconduct with respect to the presentation of evidence relating to defendant Bird. Likewise, the court satisfied it that the conduct of the U.S. Attorneys' office for the Southern District of Texas was not so "egregious" as to offend due process. *Cf. Trotter v. United States,* 359 F.2d 419, 420 (2nd Cir.1966).

**19.** The court does not at this time face the question of whether the evidence obtained from McBride as a result of Murphy's agreement with him should be admissible at trial.

## APPENDIX

Mr. William C. Roher, President

Mr. Charles E. O'Connell, Vice President Petrochemical and Plastics, Worldwide

Mr. R.J. Comeaux, Division Vice President, U.S. Petrolchem

Mr. J.E. Peppercorn, Division Vice President, U.S. Plastics

Gulf Oil Corporation

2 Houston Center

Houston, Texas

ATTENTION:

THE GULF CHEMICAL, CEDAR BAYOU PLANT AND ONE OTHER GULF FACILITY HAVE BEEN SABOTAGED.

In excess of 10 explosive charges have been placed within the Cedar Bayou Plant. These charges are both radio actuated and time actuated. The radio charges may be detonated from any point within a twenty (20) mile radius of this facility. The time actuated charges will self-detonate starting 120 hours after 10:00 a.m. on the morning you receive this letter, the time charges will continue to detonate up to seven days after this time.

So that you may assure yourselves that this threat is real you will locate a sample charge at the following location: MARKED # 1 From the control room at the Southeast end of the plant go directly east 25 feet, sample charge against north wall of the horizontal tank with berm. This charge contains explosives, caps and a set of four sequential deactivation switches; the explosives are not wired and this sample is not sealed, it is entirely safe. The various actuating circuits have not been installed both for safety and security purposes, however, be assured that they do exist and are entirely functional in the remainder of the bombs at Cedar Bayou. This sample is provided to you so that you will realize that this facility's security has been completely penetrated, and that explosives have been placed within the facility. If you choose to search your facility for the other bombs, please advise the searchers not to touch any they might find; the actual bombs contain self-defense circuits, i.e. trempler switches, mercury switches, contact switches and ground actuating switches. In addition, each device was carefully constructed separately thereby avoiding duplication of circuits.

EACH DEVICE ALSO IS EQUIPPED WITH A SET OF FOUR DEACTIVATION SWITCHES WHICH, IF ACTUATED IN THE CORRECT SEQUENCE, RENDERS THE DEVICE SAFE. THIS SEQUENCE VARIES FROM BOMB TO BOMB.

The purchase price to Gulf for the locations and deactivation sequences for the bombs at Cedar Bayou, and one other plant to be discussed, is $15,000,000.00, a fraction of Cedar Bayou's value and annual producing income.

As indicated, a facility other than Cedar Bayou has also been sabotaged. Since we consider it entirely probable that you will not believe or accept this initial communication as legitimate, we are prepared to detonate the charges within Cedar Bayou as a demonstration of both our capabilities and resolve. The Cedar Bayou facility was carefully chosen, its value to Gulf is extreme, but most importantly it is in a rural location and its destruction and subsequent conflagration will endanger a minimum number of innocent persons. The second plant, however, is located within a metropolitan area. Should it be necessary for us to destroy Cedar Bayou, the purchase price for the second facility will be $30,000,000. Should you choose to follow these initial directions, of course, the locations of the explosive charges and disarming instructions will be provided for both facilities.

Should you attempt to locate and disarm the bombs, aside from the self-defense circuits, you cannot locate all of them. Six of the devices have been placed in relatively easily seen locations, again as a method of persuading you that this plant has been sabotaged. The remainder have been carefully concealed and, in some cases, disguised. As you will note we have not given you a specific number of bombs within the facility. These devices have been placed strategically, and we believe that any one of them is sufficient to cause a chain reac-

tion involving the various volatiles at each plant. Both plants are under periodic observation; should you breach any of the following conditions they will be actuated:

1. Do not notify outside authorities. We will know if you do so.

2. Do not notify any media.

3. Do not attempt to disarm the bombs; to do so will, in all probability, cause them to self-detonate. Since these bombs are externally activated and deactivated, they have been sealed after assembly; attempting to cut them open is extremely dangerous. We are advising you of this since it is our intent to minimize possible loss of life. However, if we observe attempts to disarm the bombs we will activate those which are radio controlled.

In order to save you the time required in planning attempts at thwarting this extortion, the following information is provided for your consideration.

The planning involved in this operation has required well over one year. The persons involved in this operation are neither terrorists nor amateurs. We are, however, professional criminals, none of whom has ever been caught. During the planning period for this operation we have considered all of your options and countermoves. In each case we have redirected these back to the most salient point: Is the Cedar Bayou Plant worth $15,000,000 to your company? In addition, we have taken the precaution of preparing letters to both your facility's insuring agencies and various news organizations detailing this extortion; these letters will be sent out should it be necessary for us to destroy Cedar Bayou, or should you do so in attempting to disarm the bombs. We are sure you will see the effect on both insurance liability and public opinion should it become known that a 1.5 billion dollar facility was destroyed due to your failure to pay one percent of its value, this entirely aside from the possible loss of life and environmental damage.

The second facility has been chosen not only for its economic value, but for the effect its destruction would have on a large civilian populace. We hope that this endangerment will be unnecessary, however, as indicated earlier, we believe that you will probably ignore this first communication and the destruction of Cedar Bayou will be necessary. Be assured, if you do not meet each requirement as it is specified and when it is specified, the Cedar Bayou Plant will burn. We hope you will choose the simpler course by paying the fifteen million dollars. We will not attempt a second extortion if you choose to follow these initial direction; unnecessarily exposing ourselves twice would be both a breach of faith and stupid. In return for your cooperation you will receive all the information necessary to locate and deactivate the bombs at both facilities.

We have divided this operation into three parts: Groups One, Two and Three. Group One has placed the charges within the two plants and controls the detonating devices and the instructions for locating and deactivating each bomb. Group Two is responsible for overseeing the delivery of the payment. Additionally, Group Two has been kept secure from all members of Groups One and Three, and, in fact, knows no member of either group. Group Three is responsible for observing Group Two during the delivery, if they are taken prisoner, or if the delivery is interferred with in any way, Group Three will communicate this to Group One and the charges will be either radio detonated or allowed to self-detonate. Group Three is further responsible for inspecting the payment and insuring that the cash is usable. If the money is counterfeit, marked, comes from limited serial number ranges, or modified by any of the other methods used in tracing cash, Group One will be notified and the charges will be detonated. If Group Three is taken prisoner and does not report by a specific time, the charges will be allowed to self-detonate.

If all of our instructions are followed, within twenty-four hours after we receive the payment you will receive the information required to locate and disarm the bombs at Cedar Bayou. At the end of forty-eight hours, if all members of this operation are clear of pursuit you will be given the information required to locate

and disarm the bombs at the second facility. We fully realize that you will use every means possible to find us after your facilities are safe; we accept that risk. However, before you notify outside authorities and media, you may wish to consider the probability of amateurs attempting this same crime, with potentially disastrous results.

In conclusion, when you receive this letter, and as you will realize after you examine the sample bomb, we have the means of instantly destroying two of your major facilities. We are determined to receive from you either fifteen or thirty million dollars; that choice is yours. If we receive neither we will destroy many times that amount worth of Gulf facilities, and simply move on to other of your plants; that choice is ours.

Gentlemen, THE CLOCK IS RUNNING.

INSTRUCTIONS

1. If you decide to save Cedar Bayou by paying the fifteen million:

a. Immediately take out an advertisement in either the morning or afternoon Houston Post under the personal advertisement column as follows:

"George Liedstrom, contact your father immediately,

"_____* "

* In this blank, place the name of your representative who will be responsible for the cash delivery. Ensure that this is his real name, since instructions will be left in such a location that he will need to show identification.

Further communications will be addressed to your Houston offices, attention this name. Do not attempt to utilize this as a method of establishing direct contact; we have no need to talk directly, and any attempt to establish communications will undoubtedly be a delaying tactic on your part. It is far safer and simpler for us to destroy Cedar Bayou in order to convince you that such attempts are fruitless.

THIS ADVERTISEMENT MUST BE IN THE PAPER ON THE DAY FOLLOWING DELIVERY OF THIS LETTER.

b. Acquire $15,000,000.00 in bills of denominations of $50 or $100. This money is to be placed into five cardboard boxes, 30" × 30" × 25", each box to be lined with a plastic trash bag. Should you consider planting tracking devices in the boxes be advised that this will be inspected at the time of delivery.

We are well aware that Gulf and two other majors maintain a cash fund considerably larger than this demand, and we will not consider the non-availability of cash a reason for delay.

c. A company plane is to be kept on standby to take the individual responsible for delivery and the boxes to a destination within 1500 miles of Houston.

d. The individual responsible for the delivery will have everything necessary to rent a station wagon upon arrival at the designated destination.

e. HAVE ALL PREPARATIONS MADE BEFORE THE RECEIPT OF THE NEXT LETTER, YOU WILL HAVE VERY LITTLE TIME TO MEET THE DELIVERY SCHEDULE.

If the advertisement is seen in tomorrows Post, a letter containing further delivery instructions will be sent to Gulf Houston Headquarters and will arrive on the morning following the advertisement.

If no advertisement is seen, or if the next letters instructions are not followed precisely, please evacuate Cedar Bayou. The bombs will be allowed to detonate.

Should the Cedar Bayou plant be destroyed you will be contacted within forty-eight hours regarding our $30,000,000 demand for the second plant.

N.B. In choosing an individual to handle delivery, do not pick a hero. We would much prefer seeing this through without the necessity of taking life. If your courier follows his instructions completely he will be in absolutely no danger. Since the delivery will require the courier driving around a metro area, have him carry a firearm; it would be a shame if he was robbed.